[No. S140911. Apr. 20, 2009.]

ANGELINA MORFIN VARGAS et al., Plaintiffs and Appellants, v.
CITY OF SALINAS et al., Defendants and Respondents.

2

6

COUNSEL

Steven J. André for Plaintiffs and Appellants.

Joseph T. Francke for California Aware as Amicus Curiae on behalf of Plaintiffs and Appellants.

Nick Bulaich as Amicus Curiae on behalf of Plaintiffs and Appellants.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae.

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Steven A. Merksamer, James R. Parrinello and Christopher E. Skinnell for California Chamber of

Commerce, California Taxpayers' Association, California Business Roundtable and California Business Properties Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Anthony T. Caso and Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Vanessa W. Vallarta, City Attorney, M. Christine Davi and Jessica K. Steinberg, Deputy City Attorneys; Law Offices of Joel Franklin and Joel Franklin for Defendants and Respondents.

Nossaman, Guthner, Knox & Elliott, Stephen N. Roberts, Stanley S. Taylor and Ciarán O'Sullivan for Self-Help Counties Coalition as Amicus Curiae on behalf of Defendants and Respondents.

Stephen P. Traylor for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

Remcho, Johansen & Purcell, Robin B. Johansen, Karen Getman and Margaret R. Prinzing for League of California Cities, California State Association of Counties and League of Women Voters of Salinas Valley as Amicus Curiae on behalf of Defendants and Respondents.

---

## OPINION

**GEORGE, C. J.**—Plaintiffs—proponents and supporters of a local ballot measure that proposed the repeal of a utility users tax imposed by the City of Salinas—filed this lawsuit against the City of Salinas (the City) challenging the validity of a number of actions taken by the City relating to the ballot measure. In *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*), we explained that because of potential constitutional questions that may be presented by a public entity's expenditure of public funds in connection with a ballot measure that is to be voted upon in an upcoming election, there is a need to distinguish between (1) "campaign" materials and activities that presumptively may not be paid for by public funds, and (2) "informational" material that ordinarily may be financed by public expenditures. We noted in *Stanson* that although there are some communications or activities that clearly fall within one of these categories or the other, under some circumstances it may be necessary to examine the "style, tenor and timing" of a communication (*id.* at p. 222 & fn. 8) in order to determine whether it should be characterized as permissible or impermissible.

In the present case, the Court of Appeal concluded that in light of a statutory provision enacted subsequent to *Stanson, supra*, 17 Cal.3d 206, a municipality's expenditure of public funds on a communication relating to a ballot measure is permissible whenever the communication does not "expressly advocate" a position with regard to the ballot measure. The appellate court held that so long as a communication avoids this prohibition on "express advocacy"—a term of art originating in the context of regulations relating to private campaign contributions and expenditures, and referring to a limited and narrowly defined category of statements—there is no need to consider the communication's "style, tenor and timing" in determining the validity of the use of public funds on the communication. Because plaintiffs conceded that the materials challenged in the present case did not (within the meaning of the express-advocacy standard) expressly advocate a position regarding the ballot measure, the Court of Appeal on that basis alone concluded that plaintiffs' legal challenge lacked merit and consequently upheld the trial court's order striking plaintiffs' action under Code of Civil Procedure section 425.16, California's anti-SLAPP statute.[1]

We granted review primarily to consider whether the Court of Appeal correctly identified the legal standard applicable to publicly funded, election-related communications made by a municipality, and further to determine whether, under the appropriate standard, plaintiffs' legal challenge to the City's expenditure of public funds in this case should have been permitted to go forward.

For the reasons discussed below, we conclude that the statute relied upon by the Court of Appeal was not intended, and should not be interpreted, to displace the analysis and standard set forth in our decision in *Stanson, supra*, 17 Cal.3d 206. We further conclude that a municipality's expenditure of public funds for materials or activities that reasonably are characterized as campaign materials or activities—including, for example, bumper stickers, mass media advertisement spots, billboards, door-to-door canvassing, or the like—is not authorized by the statute in question, even when the message delivered through such means does not meet the express-advocacy standard. At the same time, we also conclude that the challenged actions of the City,

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*).) In 1992, the Legislature, finding there had been "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" (Code Civ. Proc., § 425.16, subd. (a)), enacted the motion-to-strike procedure of Code of Civil Procedure section 425.16 to provide a remedy against such lawsuits. (Hereafter, all references to section 425.16 or its subdivisions are to this section of the Code of Civil Procedure.)

here at issue, as a matter of law do not constitute improper campaign materials or activities under the standard set forth in *Stanson*. Accordingly, although we disagree with the legal standard applied by the Court of Appeal, we conclude that it correctly upheld the trial court's ruling in favor of defendants and thus that the judgment of the Court of Appeal should be affirmed.

# I

## A

The controversy that gave rise to this litigation relates to a local initiative measure—ultimately designated Measure O—that was drafted and circulated in 2001 by residents of the City. Measure O proposed the adoption of an ordinance that immediately would cut in half, and over a few years totally repeal, the City's Utility Users Tax (sometimes referred to as UUT). The UUT was a local tax that had been in place for more than 30 years and that, at the time the measure was presented to the voters, generated approximately $8 million in annual revenue for the City, a figure that represented 13 percent of the City's general fund budget.[2]

After gathering signatures, the proponents submitted the initiative petition to the county registrar of voters on September 24, 2001, and on October 3, 2001, that official certified it had been signed by the number of voters required to qualify the initiative for the ballot. Under the provisions of Elections Code section 9215, when a local initiative petition obtains the requisite number of signatures, the local legislative body must take one of three actions: (1) adopt the proposed ordinance itself without alteration, (2) submit the proposed ordinance without alteration to the voters, at either the next regularly scheduled municipal election or at a special election, or (3) direct the municipality's staff to prepare a report—as authorized by Elections Code section 9212—on the impact that the proposed ordinance likely would have on the municipality.

On October 9, 2001, the Salinas City Council adopted the third of these alternatives. Under the direction of the city manager, each of the municipal departments conducted an initial study of the measure's potential impact on the respective department, and on November 6, 2001, the city manager

---

[2] Measure O proposed to reduce the UUT from 6 percent to 3 percent upon passage of the initiative, to further reduce the tax to 1 percent on January 1, 2004, and to repeal it entirely on January 1, 2005.

submitted the requested report to the city council. The report stated in part that "the initial analysis leads to the conclusion that the repeal of the Utility Users Tax will require substantial service level reductions to City residents." At its November 6, 2001 meeting, the city council, declining to adopt the proposed ordinance itself, voted to submit it to the voters at the next regularly scheduled municipal election, to be held the following year on November 5, 2002. At the same time, the council directed city staff to conduct further study of the proposed cuts that would be required were Measure O to be adopted by the voters.

In the following months, each of the municipal departments reviewed its operations and prepared detailed reports and financial analyses discussing the reduction or elimination of specific services or programs that could be implemented in the event Measure O were adopted.

Pursuant to its usual schedule, the city council considered the proposed annual city budget for the 2002–2003 fiscal year at its June 11, 2002 meeting. Because it was not known at that time whether Measure O would be adopted at the upcoming November 2002 election, the city manager submitted a proposed budget that was based on the assumption that the City would continue to obtain revenue from the UUT at its current rate throughout the 2002–2003 fiscal year. At that meeting, the city council voted to approve and adopt the proposed budget for the 2002–2003 fiscal year. Although the budget adopted by the city council assumed the City's retention of the UUT, the material accompanying the proposed budget briefly noted program and service reductions that could be required were the UUT to be repealed. The city manager stated at the June 11 meeting that he anticipated a detailed alternative budget—setting forth program and service reductions that could be implemented should the UUT repeal be adopted—soon would be presented to the city council so that this body could consider such an eventuality at its July 16, 2002 meeting.

Two weeks later, in a lengthy report dated June 24, 2002, the city manager specifically identified the individual program and service reductions recommended by the city staff should Measure O be adopted. The report discussed in detail the financial implications of the passage of that measure, including recommended program and service reductions in each city department.

The report formally was presented to the city council at its July 16, 2002 meeting, at which numerous city residents—some supporters of Measure O, and some opponents—expressed their opinions regarding the staff recommendations and the overall impact of Measure O. After an extensive discussion at the July 16 meeting, the city council voted formally to accept the city staff's recommendations with regard to the city services and programs that would be

reduced or eliminated should Measure O be approved at the November 2002 election. The council's resolution listed numerous city facilities that would be closed and specific programs and services that would be eliminated or reduced if Measure O were adopted.

Thereafter, at four weekly meetings of the city council held throughout the month of August 2002, each of the city departments made an extensive slide presentation to the public describing the reductions in services and programs that would be implemented in the event UUT revenues were reduced and ultimately eliminated through the passage of Measure O.

At numerous city council meetings as well as at other venues, the proponents of Measure O sharply criticized the service and program reductions that had been recommended by city staff and adopted by the city council, contending that the anticipated reduction in city revenue could and should be dealt with through more efficient municipal operations and reductions in management positions and in employee salaries and benefits. At the August 20, 2002 city council meeting, the proponents of Measure O distributed a document that set forth their own analysis of the City's financial condition and of the financial implications were Measure O to pass, and that described a number of alternative courses of action that the proponents suggested would be preferable to the service and program reductions approved by the city council in the event Measure O were to be adopted.

At the August 27, 2002 city council meeting, the proponents of that measure formally presented their alternative proposals to the city council and to the public. At that same meeting, the city staff presented a report critically analyzing the financial assumptions underlying the position and alternatives submitted by the proponents.

Pursuant to the City's normal practice, detailed minutes of each city council meeting—summarizing the statements of each speaker—were posted on the official Web site maintained by the City. In addition to these minutes, the City posted on its official Web site (1) the lengthy June 24, 2002 report of the city manager setting forth the city finance department's analysis of the financial impact of Measure O and describing in detail the service and program reductions recommended for each department, (2) the slide presentations that had been made by each of the city departments at the August 2002 city council meetings, and (3) the city staff's August 27 report responding to the alternative implementation plans advanced by the proponents of Measure O.

After the city council formally voted on July 16, 2002, to specify the particular city facilities, services, and programs that the council would eliminate or reduce if the UUT were repealed, the City produced a one-page document—characterized by the proponents of Measure O as a "flyer" or "leaflet"—that briefly described the initiative measure and the background of the utility users tax and that then stated, "On July 16, 2002, the Salinas City Council unanimously identified the services that would be eliminated or reduced if the Utility Users Tax is repealed." The document then listed, in separate categories, the "Facilities To Be Closed," "Programs/Services To Be Eliminated," "Community Funding To Be Eliminated," and "Programs/Services To Be Reduced." Finally, the document advised that detailed information concerning the potential elimination or reduction of programs and services was contained in the June 24, 2002 report of the city manager, and that the report was available to the public at city hall as well as in all city libraries and on the City's Web site. Copies of the one-page document (in English and Spanish) were made available to the public in the city clerk's office at city hall and in all city libraries.[3]

In addition to producing and making available to the public this one-page document, the City also informed the public of the city council's July 16, 2002 action (identifying the services and programs that would be eliminated or reduced if the UUT were repealed) through a number of articles published in the fall 2002 edition of the City's regular quarterly "City Round-up" newsletter, a publication that was mailed to all city residents prior to October 1, 2002.[4] An article on the first page of the eight-page newsletter, entitled "Community to Decide Fate of Utility Users Tax," contained the same text as the one-page document described above. Another item, on page 3 of the newsletter, contained answers to frequently asked questions concerning the UUT, and additional articles on pages 4 and 5 of the newsletter described the proposed cuts to police, fire, and recreation/park services that would be implemented should the UUT be repealed. Other articles appearing in the fall 2002 newsletter concerned a variety of subjects of local interest unrelated to

---

[3] A copy of the English version of the one-page document is set forth in appendix A.

[4] Although a declaration of one of the plaintiffs filed early in the litigation in support of a request for a temporary restraining order asserted that "[i]t is apparent that [the newsletter in question] is not the usual quarterly issue of the newsletter because the issue and year, which are stamped in the upper corner of the regular quarterly newsletter is absent," the city manager immediately filed a responsive declaration stating explicitly that "[c]ontrary to the allegations by the Plaintiffs, the City Round-Up Newsletter was not a special issue." In a declaration filed in support of the motion to strike the complaint under section 425.16, the city manager reiterated that the newsletter in question was "[t]he City of Salinas' Fall 2002 edition of the 'Round-Up' Newsletter, Volume 3." In their opposition to the motion to strike, plaintiffs did not contest the city manager's description of the newsletter as a regular quarterly issue of the City's newsletter.

either the UUT or Measure O, including articles on local highway improvements (p. 2), a new "Neighborhood Problem Solver" guide developed by the City (p. 7), and a "Salinas Quiz" posing questions about local birds (p. 6).[5]

## B

On October 7, 2002, shortly after the city newsletter was mailed to and received by city residents, plaintiffs—a number of Salinas residents who supported Measure O—filed the underlying lawsuit against the City and various city officials, contending that the City and its officials had engaged in unlawful campaign activities in utilizing public resources and funds "to prepare and distribute pamphlets, newsletters and Web site materials." The complaint maintained that the materials in question—characterized by the complaint as "campaign materials"—"do not provide a balanced analysis of the arguments in favor of and against Measure O" and improperly were intended to influence voters against Measure O. The complaint sought declaratory, injunctive, and equitable relief, as well as the recovery of the public funds alleged to have been unlawfully expended in the production and distribution of the challenged materials (which the complaint asserted to be in excess of $250,000).

Concurrently with the filing of the complaint, plaintiffs filed an ex parte application for a temporary restraining order. Defendants filed an opposition to the application. The trial court denied the requested temporary restraining order and set a hearing on plaintiffs' request for a preliminary injunction for November 8, 2002, three days after the scheduled election. Measure O was defeated at the November 5, 2002 election. The hearing on the preliminary injunction request went forward on November 8, 2002, and at the conclusion of that hearing the trial court denied the request.

In April 2004, after the trial court had granted defendants' motion for judgment on the pleadings as to several counts of the original complaint and thereafter had permitted plaintiffs to file a supplemental complaint,[6] defendants filed a special motion to strike plaintiffs' supplemental complaint

---

[5] A copy of the newsletter is set forth in appendix B.

[6] In December 2003, plaintiffs sought permission to amend their complaint, noting that the City recently had proposed the enactment of a new special tax (Measure P) that would be placed before the voters of Salinas in March 2004, and urging the court to presume that the City would engage in improper campaign activities with respect to Measure P. Following a hearing in January 2004, the trial court permitted plaintiffs to supplement their complaint, and in early March 2004 plaintiffs filed a supplemental complaint that reiterated plaintiffs' challenge to the City's actions with regard to Measure O, and additionally alleged, on information and belief, that the City was "preparing campaign material to disseminate to

pursuant to section 425.16. In support of the motion to strike, defendants submitted declarations of numerous city officials and voluminous documentary materials, including the materials challenged by plaintiffs as improper campaign material.

Plaintiffs filed an opposition to the motion to strike, including a "statement of undisputed facts" and three supporting declarations by proponents of Measure O and their attorney. The opposition asserted, among other matters, that the materials relating to Measure O that the City made available to the public failed to include the viewpoint and positions advanced by the proponents of Measure O, that the City had ignored offers by the proponents of Measure O to provide material supporting the proponents' viewpoint, and finally that the proponents of Measure O would have utilized the City's Web site and the City's other publications, had they been offered access to those media.

In May 2004, the trial court held a hearing on defendants' motion to strike and thereafter granted the motion. After the trial court denied plaintiffs' motion for reconsideration, plaintiffs appealed from the trial court's order granting defendants' motion to strike.

## C

On appeal, the Court of Appeal affirmed the judgment entered by the trial court.

Because the appeal arose from an order granting a motion to strike under section 425.16, the appellate court undertook the two-step analysis called for by prior decisions of this court, considering first whether defendants had made a threshold showing that the challenged cause of action was one arising from "protected activity," and second, if so, whether plaintiffs had made a prima facie showing of facts that would support a judgment in their favor if proved at trial. (See, e.g., *Equilon, supra*, 29 Cal.4th 53, 67; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

With respect to the first step, the Court of Appeal rejected plaintiffs' claim that defendants failed to make the required threshold showing, explaining that (1) past California decisions uniformly hold that government entities and public employees may invoke the protection of the anti-SLAPP statute,

Salinas voters at taxpayers expense" with respect to Measure P. The supplemental complaint sought damages and declaratory, injunctive, and equitable relief with regard to both measures.

In its subsequent motion to strike the complaint, filed in April 2004, the City noted that, with respect to Measure P, plaintiffs had not identified any conduct or documents supporting the contention that the City illegally spent funds to campaign for Measure P. Plaintiffs' opposition to the motion to strike failed to challenge any activity taken by the City with regard to Measure P. Accordingly, at this stage of the proceeding, the only actions of the City that are challenged by plaintiffs are those taken by the City with regard to Measure O.

(2) the statements and communications of defendants challenged in this case clearly concern a matter of public interest, (3) the alleged illegality of defendants' conduct does not render the anti-SLAPP statute inapplicable but rather presents an issue to be addressed in the second step of the legal analysis, and (4) newly enacted Code of Civil Procedure section 425.17 does not exempt plaintiffs' action from the anti-SLAPP statute.

Having found that the communications of the City that gave rise to plaintiffs' action fall within the potential protection of the anti-SLAPP statute, the Court of Appeal went on to consider whether plaintiffs had met their burden of making a prima facie showing that they were likely to succeed on the merits. In evaluating this point, the court determined that the first matter to be addressed was the proper legal standard for evaluating whether the statements and other communications of the City challenged by plaintiffs constituted campaign materials or whether they constituted informational materials. With respect to this issue, the Court of Appeal observed: "Defendants argue for an express advocacy standard. Plaintiffs urge us to examine the materials' style, tenor, and timing, asserting that such a standard is compelled by *Stanson*[, *supra*, 17 Cal.3d 206]." Relying upon the language of a statutory provision enacted subsequent to the *Stanson* decision that explicitly prohibits a local agency's expenditure of funds with regard to "communications that expressly advocate the approval or rejection of a clearly identified ballot measure" (Gov. Code, § 54964, subd. (b)) and upon a state regulation that defines when a communication "expressly advocates" the election or defeat of a candidate or the passage or defeat of a ballot measure for purposes of campaign finance laws (Cal. Code Regs., tit. 2, § 18225, subd. (b)(2)),[7] the Court of Appeal agreed with defendants' position, concluding that "[t]o be considered unlawful promotional materials, the challenged statements must expressly advocate the election outcome." Because it found that the statements challenged by plaintiffs did not meet the express-advocacy standard, the Court of Appeal concluded that the City's statements were informational rather than campaign materials, and thus that plaintiffs failed to demonstrate a prima facie case of likely prevailing on the merits.[8]

---

[7] The regulation in question provides in relevant part: "A communication 'expressly advocates' the nomination, election or defeat of a candidate or the qualification, passage or defeat of a measure if it contains express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot,' 'vote against,' 'defeat,' 'reject,' 'sign petitions for' or otherwise refers to a clearly identified candidate or measure so that the communication, taken as a whole, unambiguously urges a particular result in an election." (Cal. Code Regs., tit. 2, § 18225, subd. (b)(2); see also *Federal Election Com'n v. Furgatch* (9th Cir. 1987) 807 F.2d 857, 860–864.)

[8] The Court of Appeal also rejected plaintiffs' related argument that the City's official Web site and newsletter constituted "public forums" from which the proponents of Measure O had been improperly excluded in violation of their free speech rights. The court held that because the City had not permitted private individuals or groups to post material on its Web site or to

We granted review primarily to determine (1) whether the Court of Appeal correctly determined that the "express advocacy" standard, rather than the standard set forth in *Stanson, supra,* 17 Cal.3d 206, is the applicable standard, and (2) whether, under the appropriate standard, the trial court properly granted defendants' motion to strike.

## II

Before reaching the question of the proper standard under which publicly funded communications relating to a pending ballot measure should be evaluated, we briefly address the threshold question whether, as a general matter, the City and its officials are entitled to invoke the protections of the motion-to-strike procedure in California's anti-SLAPP statute.

 Section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." As already noted, past cases analyzing the proper application of this statute have explained that "in ruling on a section 425.16 motion to strike, a court generally should engage in a two-step process: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 703 [54 Cal.Rptr.3d 775, 151 P.3d 1185], quoting *Equilon, supra,* 29 Cal.4th 53, 67.)

Plaintiffs initially contend that both the Court of Appeal and the trial court erred in the first step of the required analysis, asserting that the communications challenged in this case—the materials on the City's Web site, the one-page document, and the City's newsletter—do not constitute "protected activity" within the meaning of the anti-SLAPP statute. Plaintiffs contend that in view of the circumstance that the communications in question are those of a *governmental entity* rather than a *private individual or organization,* the communications cannot properly be viewed as "act[s] . . . in furtherance of the person's right of petition or free speech under the United States or

publish articles in its newsletter, those modes of communication did not constitute public forums for First Amendment purposes.

California Constitution" (§ 425.16, subd. (b)(1)) because, plaintiffs assert, *government speech*, unlike that of a private individual or organization, is not protected by the First Amendment of the federal Constitution or article I, section 2 of the California Constitution. Although plaintiffs acknowledge that a long and uniform line of California Court of Appeal decisions explicitly holds that governmental entities are entitled to invoke the protections of section 425.16 when such entities are sued on the basis of statements or activities engaged in by the public entity or its public officials in their official capacity (see, e.g., *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1113–1116 [57 Cal.Rptr.2d 207]; *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 183–184 [118 Cal.Rptr.2d 330]; *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 353 [22 Cal.Rptr.3d 724]; *Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609 [39 Cal.Rptr.3d 21]; *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1237–1238 [84 Cal.Rptr.3d 714]; *Schaffer v. City and County of San Francisco* (2008) 168 Cal.App.4th 992, 1001–1004 [85 Cal.Rptr.3d 880] (*Schaffer*)), plaintiffs essentially contend that all of these decisions were wrongly decided and should be disapproved.

■ We reject plaintiffs' contention. Whether or not the First Amendment of the federal Constitution or article I, section 2 of the California Constitution *directly* protects government speech in general or the types of communications of a municipality that are challenged here—significant constitutional questions that we need not and do not decide—we believe it is clear, in light of both the language and purpose of California's anti-SLAPP statute, that the statutory remedy afforded by section 425.16 extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity.

■ As noted, plaintiffs' argument to the contrary rests on the language of section 425.16, *subdivision (b)*, which describes the type of cause of action that is subject to a motion to strike as "[a] cause of action . . . arising from any act . . . *in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue* . . . ." (Italics added.) Plaintiffs fail to take into account, however, that section 425.16, *subdivision (e)* goes on to define this statutory phrase in very broad terms. Subdivision (e) provides in this regard: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a

legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Section 425.16, subdivision (e) does not purport to draw any distinction between (1) statements by private individuals or entities that are made in the designated contexts or with respect to the specified subjects, and (2) statements by governmental entities or public officials acting in their official capacity that are made in these same contexts or with respect to these same subjects. Although there may be some ambiguity in the statutory language, section 425.16, subdivision (e) is most reasonably understood as providing that the statutory phrase in question includes *all* such statements, without regard to whether the statements are made by private individuals or by governmental entities or officials. (See, e.g., *Schaffer, supra*, 168 Cal.App.4th 992, 1003–1004.)

■ Furthermore, to the extent there may ever have been a question whether the anti-SLAPP protections of section 425.16 may be invoked by a public entity, that question clearly was laid to rest by the Legislature's enactment of Code of Civil Procedure section 425.18, subdivision (i), in 2005—well after many of the Court of Appeal decisions noted above (see, *ante*, at p. 17) had expressly recognized the ability of public entities to bring a motion to strike under the anti-SLAPP statute. Section 425.18, subdivision (i)—a provision of the 2005 legislation dealing with so-called SLAPPback actions— expressly recognizes that a "SLAPPback" action may be "filed by a public entity," thereby necessarily confirming that a public entity may prevail on a special motion to strike under section 425.16. (See Code Civ. Proc., § 425.18, subd. (b)(1) [defining "SLAPPback" as "any cause of action for malicious prosecution or abuse of process arising from the filing or maintenance of a prior cause of action that has been dismissed pursuant to a special motion to strike under Section 425.16"].)

■ In addition to the language of the relevant statutory provisions, the purpose of the anti-SLAPP statute plainly supports an interpretation that protects statements by governmental entities or public officials as well as statements by private individuals. In setting forth the purpose of the statute and the Legislature's intent guiding its interpretation, section 425.16, subdivision (a) states in relevant part: "The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. *To this end, this section shall be construed broadly.*" (Italics added.) Moreover, the legislative history indicates that the Legislature's concern regarding the potential chilling effect that abusive

lawsuits may have on statements relating to a public issue or a matter of public interest extended to statements by public officials or employees acting in their official capacity as well as to statements by private individuals or organizations.[9] In view of this legislative purpose and history, as well as the language of section 425.16, subdivision (e) and section 425.18, subdivision (i), discussed above, we conclude that section 425.16 may not be interpreted to exclude governmental entities and public officials from its potential protection. Accordingly, we agree with the numerous Court of Appeal decisions cited above (*ante*, at p. 17) that have reached this same conclusion.

Having determined that a lawsuit against a public entity that arises from its statements or actions is potentially subject to the anti-SLAPP statute, we conclude there can be no question but that the publications and activities of the City that are at issue in the present case constitute "protected activity" within the meaning of the first step of the anti-SLAPP analysis. The published material in question encompasses statements made and actions taken in local legislative proceedings before the city council, and other communications describing the city council's potential reduction or elimination of public services and programs—statements that unquestionably concern public issues and issues of public interest.

Accordingly, we conclude that the lower courts properly found that defendants satisfied their threshold burden of demonstrating that all of the causes of action here at issue arise from activity protected under the anti-SLAPP statute, and that plaintiffs then bore the burden, under the second step of the anti-SLAPP analysis, of establishing a prima facie case on the merits.

### III

As we explained in *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733]: "In order to establish a

---

[9] Section 425.16 was first enacted in 1992. In 1997, in response to several Court of Appeal decisions that had narrowly construed the scope of the statute, the Legislature amended the measure to clarify its intent that the provisions of the statute are to be interpreted broadly. (Stats. 1997, ch. 271, § 1 [amending § 425.16, subd. (a)].) A legislative analysis of this amendment approvingly quoted a passage from a then recent law review article that identified as "a typical SLAPP suit scenario" a situation in which an abusive lawsuit is brought against both public officials and private individuals. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, p. 2, quoting Sills, *SLAPPS: How Can the Legal System Eliminate Their Appeal?* (1993) 25 Conn. L.Rev. 547 (Sills article); see also Sills article, *supra*, 25 Conn. L.Rev. 547, 550 ["Just as SLAPPs filed against individuals have a 'chilling' effect on their participation in government decision making, SLAPPs filed against public officials, who often serve for little or no compensation, may likely have a similarly 'chilling' effect on their willingness to participate in governmental processes."].)

probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citation.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" As we further elaborated on this point in *Taus v. Loftus, supra*, 40 Cal.4th 683, 714: "[W]hen a defendant makes the threshold showing that a cause of action that has been filed against him or her arises out of the defendant's speech-related conduct, the [anti-SLAPP] provision affords the defendant the opportunity, at the earliest stages of litigation, to have the claim stricken if the plaintiff is unable to demonstrate both that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim."

In the present case, plaintiffs' action is based on the contention that the City acted unlawfully in expending public funds with regard to (1) the materials relating to Measure O posted on the City's official Web site, (2) the one-page summary listing the programs and services that the city council had voted to reduce or eliminate should Measure O be adopted, and (3) the city newsletter mailed to city residents on or before October 1, 2002. The question presented, at this second step of the anti-SLAPP analysis, is whether plaintiffs established a prima facie case that any of the challenged expenditures were unlawful.

In analyzing plaintiffs' claim, we believe it is useful to begin with several statutory provisions that explicitly delineate a number of actions that a local entity may take in response to the certification and qualification of a local ballot measure.

■ Elections Code section 9215 provides in relevant part that when a local initiative petition, proposing the adoption of an ordinance, qualifies for the ballot, "the legislative body shall do one of the following: [¶] (a) Adopt the ordinance, without alteration, at the regular meeting at which the certification of the petition is presented . . . . [¶] (b) Submit the ordinance, without

alteration, to the voters [at the next regularly scheduled election or at a special election]. [¶] (c) Order a report pursuant to Section 9212 at the regular meeting at which the certification of the petition is presented. When the report is presented to the legislative body, the legislative body shall either adopt the ordinance within 10 days or order an election pursuant to subdivision (b)."

Elections Code section 9212, subdivision (a), in turn, provides that before taking action under section 9215, "the legislative body may refer the proposed initiative measure to any city agency or agencies for a report on any or all of the following: [¶] (1) Its fiscal impact. [¶] . . . [¶] (4) Its impact on funding for infrastructure of all types, including, but not limited to, transportation, schools, parks, and open space. . . . [¶] (5) Its impact on the community's ability to attract and retain business and employment. [¶] . . . [¶] (8) Any other matters the legislative body requests to be in the report." (Elec. Code, § 9212, subd. (a).)

Here, the City followed these statutes and obtained an initial report from the city agencies on the potential impact of Measure O. After considering the report, the city council decided not to adopt the proposed ordinance itself but instead to submit the matter for a vote of the electorate at the next regular municipal election. Plaintiffs do not contend that the City's actions in this regard were improper.

After the initiative measure was placed on the November 2002 ballot, city agencies, at the direction of the city council, continued to study the potential impact of the measure on city services. Ultimately, in a lengthy report to the city council, the city manager identified the particular reductions and eliminations of city services that each agency recommended be implemented should Measure O be adopted. The city council, after considering the report and receiving comment from supporters and opponents of Measure O at a public meeting, formally voted to adopt the recommended reductions and eliminations of city services that would take effect should Measure O be adopted.

Although plaintiffs take issue with the scope and nature of the recommended cuts approved by the city council—maintaining that efficiencies were available in other areas and that the City chose to single out popular services and programs in order to influence the upcoming vote on the initiative measure and increase the likelihood that the initiative measure would be defeated—plaintiffs' complaint does not contend that the city council lacked authority to adopt a legislative resolution that specifically identified the particular services and programs that would be reduced or eliminated if Measure O were approved. In any event, even had plaintiffs advanced such an argument, we have no doubt that the city council, pursuant to its general

legislative power, possessed the authority to identify, with specificity and in advance of the November 2002 election, the particular services and programs that the council would reduce or eliminate should Measure O be adopted at the upcoming election. Plaintiffs and other supporters of Measure O were free, of course, to challenge the necessity or wisdom of the proposed service and program reductions approved by the city council,[10] and to urge voters to replace the current city council members with officeholders who would take different action should the voters approve the repeal of the UUT at the November 2002 election.[11] But it is clear that the city council had the authority to inform city residents, prior to the election, of the specific actions the current city council would take if the UUT were repealed.

Although plaintiffs do not directly challenge the City's adoption of a specific plan of action that would take effect in the event the proposed initiative were to be adopted, they maintain that the City acted improperly in utilizing public resources and funds to prepare and distribute "pamphlets, newsletters and Web site materials"—denominated "campaign materials" in the complaint—informing the public of the proposed service cuts that would be implemented if Measure O were approved by the voters. The complaint objected that the materials in question "d[id] not provide a balanced analysis of the arguments in favor of and against Measure O." In advancing their claim, plaintiffs relied upon *Stanson, supra,* 17 Cal.3d 206, arguing that the

---

[10] Supporters of Measure O in fact advanced this position in an argument published in the county voter information pamphlet that was sent to voters in advance of the November 2002 election. The "Rebuttal to Argument Against Measure O" contained in the ballot pamphlet (which was signed by a number of the named plaintiffs in this action, among others) stated in part: "The pro-tax advocates have threatened to cut services—but there are other choices. [¶] **The problem is, the mayor and city council have refused to consider options like**: [¶] Reducing undisciplined spending, ending ineffective programs, and audits to expose waste [¶] Cutting top-heavy administration. Top 40 bureaucrats average cost is **$148,466 each.** [¶] **Other areas that should be trimmed**: [¶] Average city employee cost $87,195, over **30%** more than an average county worker. Overtime averages **four times** as much for a city employee as for a county worker. These figures are based on general fund spending. [¶] Health club/cash benefits for most city employees. [¶] Several generous retirement plans, and up to 10 weeks of paid time-off for city bureaucrats. [¶] **Millions can be saved with these cost saving ideas, and more at:** [¶] **www.cityofsalinas.com.**" (County of Monterey, Sample Ballot & Voter Information Pamp., Gen. Elec. (Nov. 5, 2002) rebuttal to argument against Measure O, p. 27-529, original underscoring & boldface.)

The ballot pamphlet quoted in this footnote is not included in the record on appeal, but, as an official government document, is a proper subject of judicial notice. (Evid. Code, § 452, subd. (c).) Prior to oral argument, we notified the parties that the court was considering taking judicial notice of this document and afforded them an opportunity to object. (See Evid. Code, §§ 459, subd. (c), 455, subd. (a).) No objection has been raised, and we take judicial notice of the ballot pamphlet.

[11] Two seats on the Salinas City Council, including that of the mayor, were to be filled at the November 2002 election. (See County of Monterey, Sample Ballot & Voter Information Pamp., Gen. Elec. (Nov. 5, 2002) sample ballot for City of Salinas offices, p. 27-SB724.)

City's communications, taking into account their "style, tenor and timing," properly should be characterized as campaign, rather than informational, materials or activities.

As noted, the Court of Appeal did not resolve the question whether the communications in question constituted campaign or informational material under the standard set forth in *Stanson, supra,* 17 Cal.3d 206, because the appellate court determined that the *Stanson* decision was not controlling. Instead, that court found that the City's challenged communications— regardless of their "style, tenor and timing"—would be impermissible only if those communications "expressly advocate[d]" the approval or rejection of Measure O. Because it found that the challenged communications did not meet the express-advocacy standard, the Court of Appeal held that plaintiffs' claim lacked merit. In light of the appellate court's analysis, we turn first to the question whether the statutory provision relied upon by the Court of Appeal properly should be interpreted as modifying and displacing the standard set forth in *Stanson.* We begin with a discussion of our decision in *Stanson.*

## A

In *Stanson, supra,* 17 Cal.3d 206, this court addressed a lawsuit alleging that the Director of California's Department of Parks and Recreation acted unlawfully in authorizing the department to expend more than $5,000 of public funds to promote the passage of a park bond measure that was before the voters in the June 1974 election. In analyzing the claim in *Stanson,* we initially looked to an earlier decision of this court—*Mines v. Del Valle* (1927) 201 Cal. 273 [257 P. 530]—that considered whether a municipally owned public utility acted improperly in expending $12,000 on banners, automobile windshield stickers, circulars, newspaper advertisements and the like to promote the passage of a municipal bond measure. The court in *Mines,* observing that the electors of the city who opposed the bond issue "had an equal right to and interest in the [public] funds . . . as those who favored said bonds," went on to hold that the action of the utility's board of commissioners in authorizing those expenditures "cannot be sustained unless the power to do so is given to said board *in clear and unmistakable language.*" (201 Cal. at p. 287, italics added.) Because the board's general authority to extend utility service did not meet this rigorous standard of specificity, the court in *Mines* concluded that the challenged expenditures were improper.

In *Stanson,* after observing that a significant number of out-of-state cases decided in the years since the *Mines* decision uniformly had confirmed the validity of that decision (*Stanson, supra,* 17 Cal.3d at pp. 216–217), and further explaining that, as a constitutional matter, "the use of the public

treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave[s] to the 'free election' of the people (see Cal. Const., art. II, § 2) . . . present[s] a serious threat to the integrity of the electoral process" (17 Cal.3d at p. 218), we ultimately concluded that we "need not resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by defendant Mott certainly do not authorize such expenditures in the 'clear and unmistakable language' required by *Mines*." (17 Cal.3d at pp. 219–220.) Our decision in *Stanson* thereby reaffirmed the holding in *Mines* that in the absence of clear and unmistakable language specifically authorizing a public entity to expend public funds for campaign activities or materials, the entity lacks authority to make such expenditures.

After determining that the defendant state official in that case "could not properly authorize the department to spend public funds *to campaign* for the passage of the bond issue" (*Stanson, supra*, 17 Cal.3d 206, 220, italics added), we went on to explain that "[i]t does not necessarily follow . . . that the department was without power to incur *any* expense at all in connection with the bond election. In *Citizens to Protect Pub. Funds v. Board of Education* [(1953) 13 N.J. 172,] 98 A.2d 673 [a decision of the New Jersey Supreme Court, quoted and discussed approvingly in the *Stanson* decision], the court, while condemning the school board's use of public funds to advocate only one side of an election issue, at the same time emphatically affirmed the school board's implicit power to make 'reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal.' [Citation.]" (*Ibid.*) Agreeing with this analysis, the court in *Stanson* concluded that although the applicable statutory provision did not authorize the department "to spend funds for *campaign purposes*" (*id.* at pp. 220–221, italics added), the statute did afford the department authority "to spend funds, budgeted for *informational purposes*, to provide the public with a 'fair presentation' of relevant information relating to a park bond issue on which the agency has labored" (*id.* at p. 221, italics added).

Acknowledging in *Stanson* that in some circumstances "[p]roblems may arise . . . in attempting to distinguish improper 'campaign' expenditures from proper 'informational' activities" (*Stanson, supra*, 17 Cal.3d 206, 221), we explained that "[w]ith respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising 'floats,' or television and radio 'spots' unquestionably constitutes improper campaign activity [citations], as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. [Citations.] On the other hand, it is generally accepted that a public agency pursues a proper 'informational' role when it

simply gives a 'fair presentation of the facts' in response to a citizen's request for information [citations] or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization. [Citations.]" (*Ibid.*)

After so explaining that in many instances the distinction between campaign activities and informational activities is quite evident, we also recognized in *Stanson* that at times "the line between unauthorized campaign expenditures and authorized informational activities is not so clear. Thus, while past cases indicate that public agencies may generally publish a 'fair presentation of facts' relevant to an election matter, in a number of instances publicly financed brochures or newspaper advertisements which have purported to contain only relevant factual information, and which have refrained from exhorting voters to 'Vote Yes,' have nevertheless been found to constitute improper campaign literature. (See 35 Ops.Cal.Atty.Gen. 112 (1960); 51 Ops.Cal.Atty.Gen. 190 (1968); cf. 42 Ops.Cal.Atty.Gen. 25, 27 (1964).) *In such cases*, the determination of the propriety or impropriety of the expenditure *depends upon a careful consideration of such factors as the style, tenor and timing of the publication*;[12] *no hard and fast rule governs every case*." (*Stanson, supra*, 17 Cal.3d 206, 222, italics added.)

Finally, applying the campaign/informational dichotomy to the facts before it, the court in *Stanson* held that because the appeal was from a judgment entered after the sustaining of a demurrer to the complaint, "we have no occasion to determine whether the department's actual expenditures constituted improper 'campaign' expenditures or authorized 'informational' expenses. The complaint alleges, inter alia, that defendant Mott authorized the dissemination of agency publications 'which were [not] merely . . . informative but . . . promotional' and sanctioned the distribution, at public expense, of promotional materials written by a private organization formed to promote the passage of the bond act. If plaintiff can establish these allegations at trial, he will have demonstrated that defendant did indeed authorize the improper expenditure of public funds . . . ." (*Stanson, supra*, 17 Cal.3d 206, 222–223.)

Our court subsequently had occasion to apply the principles set forth in *Stanson, supra*, 17 Cal.3d 206, in our decision in *Keller v. State Bar* (1989)

---

[12] In a footnote at this point, the court in *Stanson* reviewed the circumstances involved in one of the cited opinions of the California Attorney General. (35 Ops.Cal.Atty.Gen. 112 (1960).) In that instance, the trustees of the Madera Union High School District had placed a full-page advertisement in a general circulation newspaper, one day before a school board election. The advertisement did not expressly advocate voters to "Vote Yes" on the bond issue, but stated in large letters, "A CLASSROOM EMERGENCY EXISTS NOW AT MADERA UNION HIGH SCHOOL," and listed a number of reasons why additional funds were needed by the school district. The Attorney General's opinion concluded that, in light of the "style, tenor and timing" of the advertisement, it was impermissible to expend public funds for the advertisement. (*Id.* at p. 114.)

47 Cal.3d 1152, 1170–1172 [255 Cal.Rptr. 542, 767 P.2d 1020] (*Keller*), reversed on other grounds (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228]. In the portion of the *Keller* decision that is relevant to the issue now before us, we addressed a challenge to actions taken by the State Bar of California prior to the November 1982 judicial retention election, in which the voters were to decide whether to confirm the continued service in office of six justices of the California Supreme Court. During an inaugural speech delivered three months prior to the election, the incoming State Bar president had referred to the upcoming judicial retention election, criticizing the " 'idiotic cries of . . . self-appointed vigilantes . . . [and] unscrupulous politicians' " (47 Cal.3d at p. 1171), describing "the history of the concept of judicial independence . . . and the role and philosophy of the bar" (*ibid.*), and presenting statistics concerning the Supreme Court's review of criminal cases. Although the court in *Keller* noted that the State Bar president's speech "did not mention any justice by name, or urge the retention of any or all of the justices" (*ibid.*), we explicitly pointed out that the *Stanson* decision had explained that "it is not essential that [a] publication expressly exhort the voters to vote one way or another" in order for the publication to constitute improper campaign activity. (*Keller, supra,* 47 Cal.3d at p. 1171, fn. 22.)

While observing that the State Bar president's speech itself "cost the State Bar nothing" (*Keller, supra,* 47 Cal.3d 1152, 1171), the court in *Keller* went on to explain that the legal challenge before it concerned the State Bar's expenditure of public funds in subsequently distributing an "educational packet" that included the speech along with other items. The court in *Keller* described the distributed material as follows: "The educational packet, sent to local bar associations and other interested groups, contained [the State Bar president's] speech, a sample speech entitled 'The Case for an Independent Judiciary' (a quite restrained and philosophical exposition), sample letters to organizations which might provide a speech forum, and a sample press release. It also included fact sheets on crime and conviction rates, judicial selection and retention, and judicial performance and removal criteria. It concluded with quotations concerning judicial independence from Hamilton, Madison, Jefferson, and others." (*Id.* at pp. 1171–1172.)

In analyzing the validity of the State Bar's use of public funds to prepare and distribute this educational packet, the court in *Keller* explained: "The bar may properly act to promote the independence of the judiciary; such conduct falls clearly within its statutory charge to advance the science of jurisprudence and improve the administration of justice. In the present case, however, the nature and timing of the 1982 publication (see *Stanson* v. *Mott, supra,* 17 Cal.3d 206, 222), indicate that it is a form of prohibited election campaigning. The material was distributed approximately one month before an election in which six justices of this court came before the voters for confirmation. It is the kind of material which a state election committee distributes to local

committees to aid them in the campaign. Its style and tenor is appropriate to that end; it is basically informative and factual, but without claim of impartiality, and includes such practical tools as a form letter to groups which might host a speaker. While intended to educate the reader because its authors believed an informed campaigner would be a more effective campaigner, its primary purpose, we believe, was to assist in the election campaign on behalf of the justices. We conclude that in preparing and distributing this material, the State Bar exceeded its statutory authority." (*Keller, supra,* 47 Cal.3d 1152, 1172.)

■ Accordingly, the decision in *Keller, supra,* 47 Cal.3d 1152, explicitly confirmed and reiterated this court's conclusion in *Stanson, supra,* 17 Cal.3d 206, that even when a publication or communication imparts useful information and does not expressly advocate a vote for or against a specific candidate or ballot measure, the expenditure of public funds to prepare or distribute the communication is improper when the "style, tenor and timing" (*Stanson, supra,* 17 Cal.3d at p. 222) of the publication demonstrates that the communication constitutes traditional campaign activity.

## B

As already noted, in the present case the Court of Appeal determined that there was no need to apply the principles set forth in *Stanson, supra,* 17 Cal.3d 206, and reiterated in *Keller, supra,* 47 Cal.3d 1152, in deciding whether the communications and activities of the City challenged in this case constituted campaign or informational materials. The appellate court concluded instead that the validity of the City's expenditures turned on the question whether the challenged materials "expressly advocated" the approval or rejection of Measure O. In reaching this conclusion, the Court of Appeal relied primarily upon the provisions of Government Code section 54964 (section 54964), a statutory provision enacted in 2000. As we shall explain, we do not agree with the Court of Appeal's view that section 54964 was intended (or properly may be interpreted) to displace the governing principles and standard set forth in *Stanson.*

■ Section 54964, subdivision (a), provides that "[a]n officer, employee, or consultant of a local agency[13] may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval

---

[13] "Local agency" for purposes of section 54964 is defined to include, among other entities, a county, city (whether general law or chartered), city and county, and town, or any board, commission, or agency of such entities, but to exclude a county superintendent of schools, an elementary, high, or unified school district, or a community college district. (See Gov. Code, §§ 54964, subd. (b)(4), 54951.) The latter educational entities are subject to comparable restrictions under the terms of Education Code section 7054.

or rejection of a ballot measure, or the election or defeat of a candidate, by the voters." Section 54964, subdivision (b)(3), in turn, defines "expenditure," as used in this statute, to mean "a payment of local agency funds that is used for communications that *expressly advocate* the approval or rejection of a clearly identified ballot measure, or the election or defeat of a clearly identified candidate, by the voters." (Italics added.) At the same time, section 54964, subdivision (c), sets forth an exception to the prohibition contained in subdivision (a), providing that "[t]his section does not prohibit the expenditure of local agency funds to provide information to the public about the possible effects of a ballot measure on the activities, operations, or policies of the local agency, if both of the following conditions are met: [¶] (1) The informational activities are not otherwise prohibited by the Constitution or laws of this state. [¶] (2) The information provided constitutes an accurate, fair, and impartial presentation of relevant facts to aid the voters in reaching an informed judgment regarding the ballot measure." Accordingly, under section 54964, subdivision (c), the expenditure of public funds for a communication that otherwise would violate section 54964, subdivision (a), does not violate subdivision (a) if both of the conditions set forth in subdivision (c) are met.[14]

---

[14] Section 54964 reads in full: "(a) An officer, employee, or consultant of a local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters.

"(b) As used in this section the following terms have the following meanings:

"(1) 'Ballot measure' means an initiative, referendum, or recall measure certified to appear on a regular or special election ballot of the local agency, or other measure submitted to the voters by the governing body at a regular or special election of the local agency.

"(2) 'Candidate' means an individual who has qualified to have his or her name listed on the ballot, or who has qualified to have write-in votes on his or her behalf counted by elections officials, for nomination or election to an elective office at any regular or special primary or general election of the local agency, and includes any officeholder who is the subject of a recall election.

"(3) 'Expenditure' means a payment of local agency funds that is used for communications that expressly advocate the approval or rejection of a clearly identified ballot measure, or the election or defeat of a clearly identified candidate, by the voters. 'Expenditure' shall not include membership dues paid by the local agency to a professional association.

"(4) 'Local agency' has the same meaning as defined in Section 54951, but does not include a county superintendent of schools, an elementary, high, or unified school district, or a community college district.

"(c) This section does not prohibit the expenditure of local agency funds to provide information to the public about the possible effects of a ballot measure on the activities, operations, or policies of the local agency, if both of the following conditions are met:

"(1) The informational activities are not otherwise prohibited by the Constitution or laws of this state.

"(2) The information provided constitutes an accurate, fair, and impartial presentation of relevant facts to aid the voters in reaching an informed judgment regarding the ballot measure.

"(d) This section does not apply to the political activities of school officers and employees of a county superintendent of schools, an elementary, high, or unified school district, or a

Relying upon the circumstance that subdivision (b)(3) of section 54964 defines the term "expenditure" as used in subdivision (a) to refer to the payment of funds for communications that "expressly advocate" the approval or rejection of a ballot measure, the Court of Appeal reasoned that "section 54964 *permits* the expenditure of public funds by local agencies for communications, so long as they do not '*expressly advocate* the approval or rejection of a clearly identified ballot measure . . . by the voters.' " (First italics added.)

In our view, the Court of Appeal's reading of section 54964 is fundamentally flawed, because the statute does not affirmatively *authorize* (or *permit*) a municipality or other local agency to expend public funds on a communication that does not expressly advocate the approval or rejection of a ballot measure, but instead simply *prohibits* a municipality's use of public funds for communications that expressly advocate such a position. As indicated by the above quotation of section 54964, subdivision (a), the statute provides that "[a]n officer [or] employee . . . of a local agency may *not* expend or authorize the expenditure of any . . . funds of the local agency to support or oppose the approval or rejection of a ballot measure . . . ." (Italics added.) Nothing in section 54964 purports *to grant authority* to a local agency or its officers or employees to employ public funds to pay for communications or activities that constitute campaign activities under *Stanson, supra,* 17 Cal.3d 206, so long as such communications do not "expressly advocate" the approval or rejection of a ballot measure or candidate.

As we have seen, in *Stanson, supra,* 17 Cal.3d 206, this court, after explaining that a "serious constitutional question . . . would be posed by an *explicit* legislative authorization of the use of public funds for partisan campaigning" (*id.* at p. 219, italics added), reaffirmed our earlier holding in *Mines v. Del Valle, supra,* 201 Cal. 273, that the use of public funds *for campaign activities or materials* unquestionably is impermissible in the absence of " 'clear and unmistakable language' " *authorizing* such expenditures. (*Stanson,* at pp. 219–220.) Section 54964 does not *clearly and unmistakably authorize* local agencies to use public funds for campaign materials or activities so long as those materials or activities avoid using language that expressly advocates approval or rejection of a ballot measure. Instead, the provision *prohibits* the expenditure of public funds for communications that contain such express advocacy, even if such expenditures have been affirmatively authorized, clearly and unmistakably, by a local agency itself. Although section 54964, subdivision (c) creates an *exception* to *the statutory prohibition* for communications that satisfy the two conditions set forth in that subdivision, subdivision (c) (like the other provisions of § 54964) does *not*

community college district that are regulated by Article 2 (commencing with Section 7050) of Chapter 1 of Part 5 of the Education Code."

purport *affirmatively to grant authority* to local entities to expend funds for communications that fall within its purview.

Furthermore, the legislative history of section 54964 does not support the Court of Appeal's conclusion that this statutory provision was intended to modify or displace the principles or standard set forth in our decision in *Stanson, supra,* 17 Cal.3d 206. A committee report—analyzing a version of the bill that included the relevant provisions that ultimately were enacted into law—states in relevant part: *"The amended bill is similar to decisions of the California courts that limit the expenditures of public agency funds for political purposes.* [¶] As a general rule, a public agency cannot spend public funds to urge the voters to vote for or against a ballot measure, unless the expenditure is explicitly authorized by law (Stanson v. Mott (1976) 17 C.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]). In the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign (Stanson v. Mott). [¶] A public agency, however, can use public funds to provide educational information to the public about a ballot measure. Frequently, the line between unauthorized campaign expenditures and authorized informational material is not always clear. Public agencies may generally publish a 'fair representation of facts' relevant to an election matter, but the determination of the propriety of the expenditure may turn upon such factors as the style, tenor, and timing of the publication; no hard and fast rule governs every case (73 Ops.[Cal.]Atty.Gen. 255 (1990)). [¶] . . . [¶] The committee amendments prohibit an expenditure of local agency funds to advocate support or opposition of a certified ballot measure or a qualified candidate appearing on the local agency ballot. The amendments permit the expenditure of local agency funds to provide fair and impartial information to the public about the possible effects of a ballot measure when the informational activity is authorized under law. This language generally tracks the limitations imposed by state law on the use of state resources by state agencies, and closely parallels similar existing limitations on the use of school district and community college district resources." (Assem. Com. on Elections, Reapportionment and Const. Amends., 3d reading analysis of Assem. Bill No. 2078 (1999–2000 Reg. Sess.) as amended May 15, 2000, pp. 2–3, italics added.) Nothing in this or any other committee analysis or report related to the legislation indicates that the statute was intended to depart from or modify the *Stanson* decision.

In arguing in favor of the Court of Appeal's conclusion that section 54964 should be interpreted to substitute the "express advocacy" standard for the standard set forth in *Stanson, supra,* 17 Cal.3d 206, the City notes that at one point in the bill's progression through the Legislature the definition of "expenditure" in subdivision (b)(3) was revised to refer to a payment of funds for "communications that, *either expressly or by implication,* advocate the

approval or rejection" of a ballot measure (Sen. Amend. to Assem. Bill No. 2078 (1999–2000 Reg. Sess.) June 12, 2000, italics added), but that thereafter the "*or by implication*" language was removed from the bill (Sen. Amend. to Assem. Bill No. 2078 (1999–2000 Reg. Sess.) Aug. 25, 2000), and the legislation (as ultimately enacted) refers only to communications that "expressly advocate" the approval or rejection of a ballot measure. This legislative history does indicate that the Legislature was persuaded by numerous objections it received criticizing the "or by implication" language as too broad and vague and arguing such language was inconsistent with the legislation's stated intent not to preclude an agency from providing information to the public about the possible effects of a ballot measure because any such information plausibly might be viewed as advocating a measure's rejection or approval "by implication."[15] But this legislative history does not indicate the Legislature intended to repudiate or depart from the *Stanson* decision, or. to approve the use of public funds for activities that would constitute campaign activities under *Stanson* so long as those activities avoid expressly advocating the approval or rejection of a ballot measure.

In addition to the language and legislative history of section 54964, the constitutional concerns identified by this court in *Stanson, supra,* 17 Cal.3d 206, also militate against the Court of Appeal's interpretation of the statute. In *Stanson,* we noted that one of the principal dangers identified by our nation's founders was that "the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office . . ." (*id.* at p. 217), and we observed that "the selective use of public funds in election campaigns . . . raises the specter of just such an improper distortion of the democratic electoral process." (*Ibid.*) Whatever virtue the "express advocacy" standard might have in the context of the regulation of campaign contributions to and expenditures by candidates for public office,[16]

---

[15] For example, a "floor alert" letter to legislators from the Planning and Conservation League—sent just prior to the vote that removed the "by implication" language from the pending legislation—stated in this regard: "While agencies are already prohibited from using public funds for campaigning (a goal with which we strongly agree), this bill goes much further. Only a court will be able to determine whether an agency 'expressly or by implication' advocated a ballot measure, and agencies will be told by their counsel that they should not even take a position on a ballot measure, let alone inform their voters what the measure actually does. . . . [¶] Later the bill allows 'information' dissemination, but it will be impossible for an agency to avoid the 'or by implication' prohibition . . . , so they will simply do nothing, and default on their responsibility to inform the voters about the actual impact of the measure on their lives."

[16] The United States Supreme Court first articulated the "express advocacy" standard in *Buckley v. Valeo* (1976) 424 U.S. 1, 41–44 and footnote 52 [46 L.Ed.2d 659, 96 S.Ct. 612], as an ostensible means of distinguishing advertisements that are aimed at promoting the election or defeat of a candidate, on the one hand, from "issue" advertisements that simply express a speaker's views on an issue, on the other. More recently, however, in *McConnell v. Federal Election Comm'n* (2003) 540 U.S. 93 [157 L.Ed.2d 491, 124 S.Ct. 619], the high court

this standard does not meaningfully address the potential constitutional problems arising from the use of *public funds* for *campaign activities* that we identified in *Stanson*. If a public entity could expend public funds for *any* type of election-related communication so long as the communication avoided "express words of advocacy" and did not "unambiguously urge[] a particular result" (Cal. Code Regs., tit. 2, § 18225, subd. (b)(2)), the public entity easily could overwhelm the voters by using the public treasury to finance bumper stickers, posters, television and radio advertisements, and other campaign material containing messages that, while eschewing the use of express advocacy, nonetheless as a realistic matter effectively promote one side of an election. Thus, for example, if the City of Salinas, instead of taking the actions that are at issue in this case, had posted large billboards throughout the City prior to the election stating, "IF MEASURE O IS APPROVED, SIX RECREATION CENTERS, THE MUNICIPAL POOL, AND TWO LIBRARIES WILL CLOSE," it would defy common sense to suggest that the City had not engaged in campaign activity, even though such advertisements would not have violated the express-advocacy standard.[17]

---

recognized that political experience since *Buckley* has demonstrated the ineffectiveness and artificial nature of the "express advocacy" standard. As the court in *McConnell* explained: "While the distinction between 'issue' and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words [such as 'Elect John Smith' or 'Vote Against Jane Doe']. Little difference existed, for example, between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue and exhorted viewers to 'call Jane Doe and tell her what you think.' Indeed, campaign profession-als testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words." (*McConnell, supra*, 540 U.S. at pp. 126–127, fns. omitted.)

[17] The hypothetical message just discussed neither contains "express words of advocacy" nor "unambiguously urges a particular result," inasmuch as some voters might believe that the identified public facilities are unnecessary or that public funds would be better spent for other purposes.

In addition to the hypothetical example discussed above, the facts presented in one relatively recent out-of-state decision provide a concrete illustration of why the express-advocacy standard is inadequate to restrain a municipality's improper use of public funds for campaign activities.

In *Dollar v. Town of Cary* (2002) 153 N.C.App. 309 [569 S.E.2d 731], the plaintiff challenged the defendant town council's appropriation of $200,000 in public funds for a proposed campaign " 'to better inform citizens about growth management issues' " by promoting the merits of "smart growth" or "managed growth" policies. The appropriated funds were to be spent for " 'direct mail, media buys, and contracted services' " as part of "a coordinated print, radio and television campaign" to be run from September 6, 2001, through November 19, 2001, a time period coinciding with the upcoming town council elections. (569 S.E.2d at p. 732.) Although no incumbents were running to retain their seats in the upcoming election, undisputed evidence established that the current town council's "slow growth" or "managed growth" policies were an important issue in the campaign, with several candidates aligning themselves with the current council's policies and other candidates opposing those policies. Taking into

Thus, when viewed from a realistic perspective, the "express advocacy" standard does not provide a suitable means for distinguishing the type of *campaign* activities that (as *Stanson* explains) presumptively may not be paid for with public funds, from the type of *informational* material that presumptively may be compiled and made available to the public through the expenditure of such funds. And, as we have seen, there is no indication that, in enacting section 54964, the Legislature intended to modify or displace the principles and analysis set forth in the *Stanson* decision.

The City, and amici curiae supporting the City, contend nonetheless that the "express advocacy" standard is preferable to the standard adopted in *Stanson, supra*, 17 Cal.3d 206, asserting that because our opinion states that in some circumstances "the style, tenor and timing" of a communication must be considered in determining whether the communication is properly treated as campaign or informational activity (see *id.* at p. 222), the *Stanson* standard is unduly vague and imposes an unconstitutional chilling effect on a public entity's right to provide useful information to the voters. Putting aside the question whether *a public entity* possesses a *constitutional right* (under either the federal or the state Constitution) to provide information relating to a pending ballot measure—an issue that is a prerequisite to the City's unconstitutional-chilling-effect argument but one that we need not and do not decide—we reject the contention that the line drawn in *Stanson* between the use of public funds for *campaign activities* and the use of such funds for *informational material* is unduly or impermissibly vague. As we have seen, the *Stanson* decision explicitly identified a number of materials and activities that unquestionably constitute campaign activities (without any need to consider their "style, tenor and timing")—for example, the use of public funds to purchase bumper stickers, posters, advertising "floats," or television and radio "spots"—and also identified a number of activities that are clearly informational—for example, providing a fair presentation of facts in response to a citizen's request for information. (*Stanson*, at p. 221.) The circumstance that *in some instances* it may be necessary to consider the style, tenor, and timing of a communication or activity to determine whether, from an objective standpoint, the communication or activity realistically constitutes

---

account the nature and timing of the proposed expenditures, the court in *Dollar* concluded that "[t]he advertisements, in the context of the Council elections, appear to be more than informational in nature and instead implicitly promote the candidacy of those Council candidates in sympathy with the Council's position on the Town's growth." (569 S.E.2d at p. 734.) Accordingly, the court in *Dollar* affirmed the trial court's ruling enjoining the council from using public funds in that manner.

If a municipality's election-related expenditures were constrained only by an express-advocacy standard, as urged here by the City and held by the Court of Appeal, there would be no restriction upon a public entity's expenditure of public funds in the manner described in the *Dollar* decision, even when the disbursements are made during a local election campaign and for such traditional campaign activities as newspaper, radio, and television advertisements.

*campaign* activity rather than *informational* material, does not render the distinction between campaign and informational activities impermissibly vague. Since our decision in *Stanson*, numerous out-of-state decisions have cited that opinion and utilized a comparable analysis in evaluating the propriety of public expenditures for a variety of election-related material and activities (see, e.g., *Anderson v. Boston* (1978) 376 Mass. 178 [380 N.E.2d 628], app. dism. for want of substantial federal question *sub nom. Boston v. Anderson* (1979) 439 U.S. 1060 [59 L.Ed.2d 26, 99 S.Ct. 822]; *Smith v. Dorsey* (Miss. 1992) 599 So.2d 529, 540–544; *Burt v. Blumenauer* (1985) 299 Ore. 55 [699 P.2d 168, 171–181]; *Dollar v. Town of Cary, supra*, 569 S.E.2d 731, 733–734), and the City has failed to cite any authority that has concluded the *Stanson* standard is unconstitutionally vague. (See *Sweetman v. State Elections Enforcement Commission* (1999) 249 Conn. 296 [732 A.2d 144, 160–162] [explicitly rejecting similar constitutional vagueness challenge].)

Accordingly, we conclude the campaign activity/informational material dichotomy set forth in *Stanson, supra*, 17 Cal.3d 206, 220–223, remains the appropriate standard for distinguishing the type of activities that presumptively may not be paid for by public funds, from those activities that presumptively may be financed from public funds. The Court of Appeal erred in relying solely upon the circumstance that the challenged communications of the City did not expressly advocate the approval or rejection of Measure O, and in failing to evaluate the City's activities under the *Stanson* standard.

## C

As discussed above, contrary to the conclusion of the Court of Appeal, section 54964 does not affirmatively *authorize* a local agency to expend funds for communications relating to a ballot measure, but instead simply *prohibits* the expenditure of public funds under some circumstances. Consequently, the City's expenditure of funds for the communications and activities here at issue must rest upon some other authority.

From the record before us, it appears that the expenditures in question were made pursuant to the general appropriations in the City's regular annual budget pertaining to the maintenance of the City's Web site, the publication of the City's regular quarterly newsletter, and the ordinary provision of information to the public regarding the City's operations. The record does not indicate that the city council approved any special measure that purported, clearly and unmistakably, to grant the City explicit authority to expend public funds for *campaign activities* relating to Measure O. Accordingly, as was the case in *Stanson, supra*, 17 Cal.3d 206, 219–223, the question whether the City's expenditures that are challenged in this case were or were not validly

incurred turns upon whether the activities fall within the category of informational activities that may be funded through such general appropriations or, instead, constitute campaign activities that may not be paid for by public funds in the absence of such explicit authorization.

As discussed above, plaintiffs challenge three groups of communications by the City that relate to Measure O: (1) the material posted on the City's official Web site, (2) the one-page document made available to the public at the city clerk's office and in public libraries, and (3) the municipal newsletter mailed to all city residents on or before October 1, 2002. The content of all of these communications relates to the reduction and elimination of city services, programs, and facilities that the city council voted to implement should Measure O be approved at the November 2002 election. None of these materials or publications constitute the kind of typical campaign materials or activities that we identified in *Stanson, supra*, 17 Cal.3d 206, 221 ("bumper stickers, posters, advertising 'floats,' or television and radio 'spots' . . . [or] the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure"), but the items listed in *Stanson* do not exhaust the category of potential campaign materials or activities. Plaintiffs contend that when the "style, tenor and timing" of the challenged communications are taken into account, the communications should be viewed as improper campaign materials rather than as permissible informational materials. Plaintiffs' principal argument in this regard is that the communications in question failed to include the views expressed by the proponents of Measure O in opposition to the action taken by the city council—views that challenged the necessity and wisdom of the proposed cutbacks in city services. Plaintiffs contend that by failing to set forth these competing views, the communications in question improperly "took sides" on the ballot measure and should be viewed as improper campaign activity.

In advancing this argument, plaintiffs appear to rely in significant part on a passage in *Stanson, supra*, 17 Cal.3d 206, that cautioned against the government's "taking sides" in an election contest. The opinion in *Stanson* stated in this regard: "A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citations]; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (17 Cal.3d at p. 217.)

A full reading of the *Stanson* decision reveals, however, that our opinion's statement that the government "may not 'take sides' in election contests" (*Stanson, supra*, 17 Cal.3d 206, 217) properly must be understood as singling out a public entity's "use of the public treasury *to mount an election campaign*" (*id.* at p. 218, italics added) as the potentially constitutionally suspect conduct, rather than as precluding a public entity from analytically evaluating a proposed ballot measure and publicly expressing an opinion as to its merits. As we have seen, in *Stanson* we explicitly recognized that a governmental agency "pursues a proper 'informational' role when it . . . authorizes an agency employee to present *the department's view of a ballot proposal* at a meeting of [a private or public] organization" (*Stanson, supra*, 17 Cal.3d at p. 221, italics added), thus making it clear that it is permissible for a public entity to evaluate the merits of a proposed ballot measure and to make its views known to the public. Accordingly, we agree with those Court of Appeal decisions rendered after *Stanson* that explicitly have held that *Stanson* does not preclude a governmental entity from publicly expressing an opinion with regard to the merits of a proposed ballot measure, so long as it does not expend public funds to mount a campaign on the measure. (See, e.g., *Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 429 [21 Cal.Rptr.2d 303]; *League of Women Voters v. Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 560 [250 Cal.Rptr. 161].)

Indeed, upon reflection, it is apparent that in many circumstances a public entity inevitably will "take sides" on a ballot measure and not be "neutral" with respect to its adoption. For example, when a city council or county board of supervisors votes to place a bond or tax measure before the voters, it generally is quite apparent that the governmental entity supports the measure and believes it should be adopted by the electorate. Similarly, when a city council is presented with a local initiative petition that has been signed by the requisite number of voters and declines to enact the measure into law itself but instead places the matter on the ballot, in at least most cases a reasonable observer would infer that a majority of the council does not support adoption of the measure. Thus, the mere circumstance that a public entity may be understood to have an opinion or position regarding the merits of a ballot measure is not improper. (See also, e.g., Elec. Code, § 9282 [authorizing local legislative body to author a ballot pamphlet argument for or against any city measure].)

The potential danger to the democratic electoral process to which our court adverted in *Stanson, supra*, 17 Cal.3d 206, 217, is not presented when a public entity simply informs the public of its opinion on the merits of a pending ballot measure or of the impact on the entity that passage or defeat of the measure is likely to have. Rather, the threat to the fairness of the electoral process to which *Stanson* referred arises when a public entity or

public official is able to devote funds from the public treasury, or the publicly financed services of public employees, to *campaign activities* favoring or opposing such a measure.

In the present case, the city council, faced with the possibility of a substantial reduction in revenue in the middle of the 2002–2003 fiscal year should Measure O be approved by the voters at the November 2002 election, had the authority to decide, in advance of the election, which services would be cut should the measure be adopted, and then to inform the City's residents of the council's decision. In posting on the City's Web site the detailed minutes of all the city council meetings relating to the council's action, along with the detailed and analytical reports prepared by the various municipal departments and presented by department officials at city council meetings, the City engaged in permissible *informational* rather than *campaign* activity, simply making this material available to members of the public who chose to visit the City's Web site. Because the proponents of Measure O spoke and made presentations at a number of city council meetings, summaries of the proponents' positions were included in the minutes of those meetings, were posted on the Web site, and thus were available to persons who visited the Web site, but the City had no obligation to provide the proponents of Measure O with special access to enable them to post material of their own choosing on the City's official Web site. The declarations submitted in the trial court establish that this Web site is not a public forum on which the City permits members of the public to freely post items or exchange views; the City retains the authority to decide what material is posted on its official Web site.[18] We conclude that the City engaged in informational rather than campaign activity, within the meaning of *Stanson, supra,* 17 Cal.3d 206, in posting the material in question on its Web site.

Similarly, the City did not engage in campaign activity in producing the one-page document listing the service and program reductions that the city council had voted to implement should Measure O be adopted (see appen. A), or in making copies of the document available to the public at the city clerk's

---

[18] Although plaintiffs contend the City's official Web site constitutes a public forum for constitutional purposes, to which equal access must be provided to all competing factions, the governing authorities do not support this assertion, because the City has not opened its Web site to permit others to post material of their choice. (See, e.g., *United States v. American Library Assn., Inc.* (2003) 539 U.S. 194, 204–206 [156 L.Ed.2d 221, 123 S.Ct. 2297]; *Arkansas Ed. Television Comm'n v. Forbes* (1998) 523 U.S. 666, 673–677 [140 L.Ed.2d 875, 118 S.Ct. 1633]; *Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 803–806 [87 L.Ed.2d 567, 105 S.Ct. 3439]; *Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37, 46 [74 L.Ed.2d 794, 103 S.Ct. 948]; *Clark v. Burleigh* (1992) 4 Cal.4th 474, 482–491 [14 Cal.Rptr.2d 455, 841 P.2d 975].)

office and at public libraries. Not only does the document in question not advocate or recommend how the electorate should vote on the ballot measure, but its style and tenor are not at all comparable to traditional campaign material. Viewed from the perspective of an objective observer, the document clearly is an informational statement that merely advises the public of the specific plans that the city council voted to implement, should Measure O be adopted. Furthermore, the informational nature of the document is reinforced by the circumstance that the City simply made it available at the city clerk's office and in public libraries to members of the public who sought out the document.

Finally, we also conclude the City did not engage in impermissible campaign activity by mailing to city residents the fall 2002 "City Round-up" newsletter containing a number of articles describing the proposed reductions in city services that the city council had voted to implement, should Measure O be adopted. (See appen. B.) Although under some circumstances the mailing of material relating to a ballot measure to a large number of potential voters shortly before an upcoming election unquestionably would constitute campaign activity that may not properly be paid for by public funds, a number of factors support the conclusion that the City's mailing of the newsletter here at issue constituted informational rather than campaign activity.

First, it is significant that this particular newsletter was a regular edition of the City's quarterly newsletter that as a general practice was mailed to all city residents, rather than a special edition created and sent to would-be voters, specifically because of the upcoming election regarding Measure O. In this respect, the newsletter in question is clearly distinguishable from the special edition newsletter that was before the United States Supreme Court in *FEC v. Massachusetts Citizens for Life, Inc.* (1986) 479 U.S. 238, 250–251 [93 L.Ed.2d 539, 107 S.Ct. 616] (*Massachusetts Citizens for Life*).[19]

Second, the city council's July 16, 2002 resolution—identifying a significant number of current city services and programs that would be reduced or eliminated, should Measure O be adopted—quite clearly was an obvious and natural subject to be reported upon in a city's regular quarterly newsletter, and the style and tenor of the publication in question were entirely consistent

---

[19] In *Massachusetts Citizens for Life, supra*, 479 U.S. 238, the high court explained that the special edition of the organization's newsletter at issue in that case "cannot be considered comparable to any single issue of the newsletter. It was not published through the facilities of the regular newsletter, but by a staff which prepared no previous or subsequent newsletters. It was not distributed to the newsletter's regular audience, but to a group 20 times the size of that audience, most of whom were members of the public who had never received the newsletter. No characteristic of the Edition associated it in any way with the normal MCFL publication." (*Id.* at p. 250.)

with an ordinary municipal newsletter and readily distinguishable from traditional campaign material. Like the one-page document discussed above, the front-page article of the newsletter relating to Measure O simply identified the specific city services and programs that the city council had voted to reduce or eliminate, should Measure O be adopted. The additional articles that described in more detail the potential cuts in services affecting the police, fire, and park and recreation departments, although at times conveying the departments' views of the importance of such programs, were moderate in tone and did not exhort voters with regard to how they should vote.

Further, the article setting forth answers to frequently asked questions about the utility users tax provided city residents with important information about the tax—including the annual cost of the tax to the average resident—in an objective and nonpartisan manner. The content of this newsletter clearly distinguishes it from the kind of blatantly partisan, publicly financed agency newsletter that the New York Court of Appeals held improper in *Schulz v. State of New York* (1995) 86 N.Y.2d 225 [630 N.Y.S.2d 978, 654 N.E.2d 1226] (*Schulz*),[20] or from the type of promotional campaign brochure that, on at least one occasion, has been mailed to voters by a California public entity in the past.[21] Under these circumstances, we conclude that the City engaged in permissible informational activity, rather than impermissible campaign activity, in publishing and mailing the newsletter in question.[22]

---

[20] In *Schulz*, the court considered a newsletter that had been published and mailed by the New York Governor's Office of Economic Development in advance of the 1992 presidential election and that discussed welfare reform, an issue of primary interest in the presidential campaign. In describing the newsletter, the court in *Schulz* observed: "Although the newsletter contained a substantial amount of factual information which would have been of assistance to the electorate in making an educated decision on whose position to support on that issue, the paper [i]ndisputably ' "convey[ed] . . . partisanship, partiality . . . [and] disapproval by a State agency of [an] issue" ' [citation]. Thus, the newsletter states: [¶] 'Led by the Bush Administration, Republicans in New York and across the nation are seeking to slash assistance to the needy.['] 'The Republicans appear to have devised a strategy of using distortions and half-truths about Medicaid and welfare to divide the people in a key election year.' " (*Schulz, supra*, 654 N.E.2d at p. 1231.) The court in *Schulz* held: "The conclusion is unavoidable that the latter portion of the newsletter is 'patently designed to *exhort* the electorate to [make an avowed, public commitment] in support of a particular position advocated by [one political faction].' " (*Ibid.*)

[21] At the request of amici curiae California Chamber of Commerce and other organizations, we have taken judicial notice of two brochures that were mailed to voters by the Solano Transportation Improvement Authority in relation to a local transportation measure (Measure M) that was before the voters in the November 2006 election.

[22] In addition to maintaining that the distribution of the fall 2002 "City Round-up" newsletter constituted campaign activity, plaintiffs also argue, as they have with regard to the City's official Web site, that the city newsletter constitutes a public forum and that the City had an obligation to offer the proponents of Measure O the opportunity to include in the newsletter their objections to the city council's action. As with the City's official Web site, however, the

In sum, a variety of factors contributes to our conclusion that the actions of the City that are challenged in this case are more properly characterized as providing information than as campaigning: (1) the information conveyed generally involved past and present facts, such as how the original UUT was enacted, what proportion of the budget was produced by the tax, and how the city council had voted to modify the budget in the event Measure O were to pass; (2) the communications avoided argumentative or inflammatory rhetoric and did not urge voters to vote in a particular manner or to take other actions in support of or in opposition to the measure; and (3) the information provided and the manner in which it was disseminated were consistent with established practice regarding use of the Web site and regular circulation of the city's official newsletter.

Furthermore, we emphasize that the principles that we have applied in this setting are equally applicable without regard to the content of whatever particular ballot measure may be before the voters—whether it be a tax-cutting proposal such as that involved in this case, a "slow-growth" zoning measure restricting the pace of development, a school bond issue providing additional revenue for education, or any other of the diverse local ballot measures that have been considered in California municipalities in recent years. (See, e.g., Cal. Elections Data Archive, Cal. County, City and School District Election Outcomes: 2004 Elections: City Offices and Ballot Measures, City Report, table 1.2, pp. 21–43 <http://www.csus.edu/isr/isr3.html> [as of Apr. 20, 2009].) In any of these contexts, a municipality's expenditure of public funds must be consistent with the standard set forth in *Stanson, supra*, 17 Cal.3d 206.

■ In the present case, we conclude, on the basis of the facts established by the materials submitted in support of and in opposition to the motion to strike, that all of the activities of the City that are challenged by plaintiffs constitute permissible informational activities—and not inappropriate campaign activities.

### D

For the reasons discussed above, we conclude that the City and the other defendants established that the communications that gave rise to plaintiffs' action fall within the scope of the anti-SLAPP statute, and that plaintiffs failed to meet their resultant burden of establishing a prima facie case that defendants' actions were unlawful. Thus, the trial court properly granted defendants' motion to strike plaintiffs' action under the anti-SLAPP statute.

City did not permit private persons or organizations to publish material in the city newsletter, and thus the newsletter did not constitute a public forum to which the proponents of Measure O had a right of access. (See, e.g., *Arkansas Ed. Television Comm'n v. Forbes, supra*, 523 U.S. 666, 672–675; *Clark v. Burleigh, supra*, 4 Cal.4th 474, 482–491.)

## IV

As explained above, although we conclude that the Court of Appeal applied an incorrect standard in evaluating the validity of the City's conduct, we nonetheless conclude that the appellate court reached the correct result in upholding the trial court's order granting defendants' motion to strike the supplemental complaint. Accordingly, the judgment of the Court of Appeal is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**MORENO, J., Concurring.**—I agree with the majority that the "express advocacy" standard does not fully capture the limitations on the public funding of communication in connection with political campaigns. I also agree with the majority that the City of Salinas's expenditures in the present case were lawful. I write to further analyze the relationship between the relevant statute and case law. I also write to explain why the majority's holding, based on *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*), a case that preceded dramatic changes in the structure of government financing that have occurred over the last 30 years, may not be the final word on the issue.

As suggested by the majority, and by the court in *Stanson*, there are broadly speaking two types of limitations on public funding of government communications in connection with ballot initiative campaigns: (1) limitations on the *content* of communications that government agencies may fund; and (2) limitations on the *means* used by local governments to disseminate their communications.

Government Code section 54964 (section 54964) is concerned with the first type of limitation—the contents of the communication. Section 54964, subdivisions (a) and (b) prohibit the "payment of local agency funds that is used for communications that *expressly advocate* the approval or rejection of a clearly identified ballot measure, or the election or defeat of a clearly identified candidate, by the voters." (§ 54964, subd. (b)(3), italics added.) Section 54964, subdivision (c), provides that "[t]his section does not prohibit the expenditure of local agency funds to provide information to the public about the possible effects of a ballot measure on the activities, operations, or policies of the local agency, if both of the following conditions are met: [¶] (1) The informational activities are not otherwise prohibited by the Constitution or laws of this state. [¶] (2) The information provided constitutes an accurate,

fair, and impartial presentation of relevant facts to aid the voters in reaching an informed judgment regarding the ballot measure." Therefore, read as a whole, section 54964 permits expenditures for communications that do not expressly advocate passage of a ballot measure and are informational in nature. As the majority correctly notes, the Legislature considered and rejected a prohibition on advocacy "by implication." (Maj. opn., *ante*, at pp. 30–31.)

As an initial matter, I note that plaintiffs would interpret section 54964 to require that the government limit itself to "undisputed factual information" and not weigh in on "debatable questions." But section 54964, subdivision (c) does not say that the government is obliged to inform the public regarding all sides of the debate about a given ballot measure, or that it must view all sides with equal favor. Rather, it is authorized to inform the public about the "possible effects of a ballot measure on the activities, operations, or policies of the local agency." A government agency's analysis and discussion of that topic may be controversial or not universally agreed upon, and it cannot be the case that section 54964, subdivision (c) would for that reason prohibit it. "[A]ccurate, fair, and impartial" implies a certain kind of objective and factual approach, not necessarily a noncontroversial outcome, rather like a judicial opinion that is firmly grounded in the facts and the law and established methods of legal reasoning, but which may be contested by a dissent similarly grounded. On the other hand, the "undisputed factual information" standard would mean that the government could not communicate any information unless there was complete agreement about its truth, no matter how unreasonable the contrary position is—a virtually impossible standard and doubtless not what the Legislature intended. I therefore agree with the majority's implicit rejection of plaintiffs' interpretation of section 54964, subdivision (c).

Although section 54964 regulates the contents of the communications a government agency may fund in the course of a political campaign, it does not address the second prong discussed above, the *means* by which such communication can be disseminated. This topic is covered substantially in *Stanson*. Indeed, in its pivotal distinction between "improper 'campaign' expenditures" and "proper 'informational' activities" (*Stanson, supra*, 17 Cal.3d at p. 221), *Stanson* focused in large part on the methods by which the government's messages are communicated: "With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising 'floats,' or television and radio 'spots' unquestionably constitutes improper campaign activity [citations], as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. [Citations.] On the other hand, it is generally accepted that a public agency pursues a proper 'informational' role when it simply gives a 'fair presentation of the facts' in response

to a citizen's request for information [citations] or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization. [Citations.]" (*Ibid.*, fn. omitted.) *Stanson* also critically refers to the "style, tenor and timing" of communications to determine whether they constitute improper campaign activity. (*Id.* at p. 222.)

I agree with the majority that the fact that section 54964 addressed only the permissible content of government-funded communications about ballot measures does not mean that it was intended to supersede *Stanson*'s statements circumscribing the means of disseminating the communications. Such a repudiation or modification of *Stanson* is neither evident in the language of the statute nor, as the majority points out, in the legislative history. (Maj. opn., *ante*, at p. 30.) Thus, in addition to the legislative command pursuant to section 54964 that local government agencies not engage in "express advocacy" and that they fund only those communications about ballot measures that are informational in nature, such communications must also pass the *Stanson* test of not using methods that constitute campaign activity.

With respect to those methods, it is noteworthy that today's decision makes clear, in a way that *Stanson* did not, that a government agency's informational activities with respect to ballot measures are not limited to responses to citizen requests, but can also entail proactive measures to inform citizenry about the probable effects of a ballot measure. Municipalities are statutorily authorized to gather information about the impacts of proposed ballot measures (Elec. Code, § 9212) and are often uniquely well positioned to disseminate such information. Nor do I understand the various methods used by the city in the present case, which the majority correctly concludes are lawful, to necessarily represent the outer limits of permissible publicly funded communications. Precisely where such outer limits are to be drawn awaits other cases.

It also remains to be seen whether the concept of prohibited "campaign activity" set forth in *Stanson*, and reaffirmed by the majority meets the current needs of governance. Since *Stanson* was decided over 30 years ago, local government finance in California has undergone a sea change. One aspect of that transformation is that after the passage of Proposition 13 in 1978 and subsequent measures, the power to raise local revenues has shifted from the local legislatures—the city councils, boards of supervisors, school boards and boards of directors of special agencies—to the electorate, which now must approve all revenue increases and increases in bonded indebtedness at the ballot box, usually by a supermajority vote. (See Cal. Const., arts. XIIIA, XIIIC.) In other words, the local government legislative power to finance government projects and services no longer resides with the local

legislative body as it did when *Stanson* was written, but with the local electorate. Thus, for example, whereas in the 1978 general election, one ballot initiative relating to local taxes and none to local bond issues was reported in Los Angeles County, in the 2008 general election 11 local tax initiatives and 21 bond initiatives were reported. (County of L.A., Off. of Registrar-Recorder, Official Election Returns, Gen. Elec. (Nov. 7, 1978); County of L.A., Dept. of Registrar-Recorder/County Clerk, Final Official Election Returns, Gen. Elec. (Nov. 4, 2008).)

In this context, local and regional agencies sometimes have been specially charged with the task of sponsoring ballot propositions to raise revenue to fund various infrastructure improvements and services that are deemed necessary. The critical role of local governments in such sponsorship is illustrated by the recent case of *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229 [84 Cal.Rptr.3d 714] (*Santa Barbara County*). By statute, the county transportation authority (SBCAG), was "specifically empowered to impose a retail transaction and use tax of up to 1 percent to fund transportation improvements and services in its county. (Pub. Util. Code, § 180202.) Before a sales tax may be imposed, however, the authority must adopt a 'transportation expenditure plan' for revenues 'expected to be derived from' the tax, approve an ordinance imposing the tax, and obtain approval of the ordinance by 'a majority of the electors voting on the measure . . . at a special election called for that purpose by the board of supervisors, at the request of the authority . . . .' (Pub. Util. Code, §§ 180201, 180206.)" (*Santa Barbara County, supra*, 167 Cal.App.4th at pp. 1239–1240.)

SBCAG proposed a ballot proposition, Measure A, for the November 2008 ballot seeking to extend the 0.5 percent countywide sales tax to fund various transportation projects and services. (*Santa Barbara County, supra*, 167 Cal.App.4th at p. 1234.) It was opposed by the Santa Barbara County Coalition Against Automobile Subsidies, a nonprofit corporation. Plaintiff corporation filed a complaint against SBCAG, claiming it was engaging in illegal campaign activity. As the court explained: "SBCAG retained a private consultant to survey voter support for an extension of the sales tax. The consultant determined the arguments in favor of extension that were received most favorably by the voters polled, potential arguments in opposition, and the best strategy to maximize voter support. In addition, SBCAG staff and committee members attended public meetings with civic groups during which staff presented information regarding the transportation expenditure plan, and the importance of extending the 1989 sales tax to satisfying the county's transportation needs." (*Ibid.*)

The Court of Appeal upheld the trial court's grant of SBCAG's motion to strike pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16, holding there was no probability of plaintiff's prevailing on the merits. The Court of Appeal's conclusion that SBCAG's actions did not constitute unlawful campaign activity largely turned on the fact that all the activity at issue had occurred before the measure was placed on the ballot. As the court explained: "SBCAG was performing its legislative duty to obtain financing for county transportation needs. [¶] Governments must provide facilities and services that require funding through taxation. The SBCAG is permitted and even required to expend public funds to determine the cost of the county's transportation needs and propose ordinances calling for elections to obtain the necessary revenue. When a government agency's activity represents its ' ". . . judgment of what is required in the effective discharge of its responsibility, it is not only the right but perhaps the duty of the body to endeavor to secure the assent of the voters thereto." ' " (*Santa Barbara County, supra*, 167 Cal.App.4th at pp. 1240–1241.)

Although the court's decision rested on the fact that SBCAG's activity preceded placement on the ballot, the case highlights the tension between on the one hand statutorily authorizing government agencies to propose revenue raising ballot initiatives (see also Elec. Code, §§ 9140, 9222 [authorizing boards of supervisors and city councils to submit ballot questions to voters]), and on the other hand forbidding them from campaigning for those initiatives. Under these circumstances, it would seem a government agency has a special role to play in informing the electorate about the reasons for enacting the measure it has proposed. That information must be, to be sure, "an accurate, fair, and impartial presentation of relevant facts" (§ 54964, subd. (c)(2)), but it necessarily will involve some degree of advocacy, since the agency is itself sponsoring the ballot measure based on its assessment of local needs.

The extent to which the funding of an active informational campaign to promote or defend a lawfully government-sponsored ballot measure would fit within *Stanson*'s and the majority's informational/campaign activity dichotomy is not entirely clear. Yet as the majority reaffirms, courts are not necessarily the final word on the matter. *Stanson*'s and the majority's holdings are limited to situations in which there is no "clear and unmistakable [legislative] language specifically authorizing a public entity to expend public funds for campaign activities or materials." (Maj. opn., *ante*, at p. 24; see also *Stanson, supra*, 17 Cal.3d at pp. 219–220.) Indeed, one of the strengths of the majority opinion, and of *Stanson*, is that they leave room for the possibility of legislative innovation in this area to respond to new or unique circumstances.

Of course, any such legislation would have to conform to constitutional constraints so as to preserve "the integrity of the electoral process." (*Stanson, supra,* 17 Cal.3d at p. 218.) At the very least, such legislation must follow Professor Tribe's dictum that "government [may] add its own voice to . . . many . . . it must tolerate, provided it does not drown out private communication." (Tribe, American Constitutional Law (2d ed. 1988) § 12-4, p. 807.) But at a time when government sponsorship of revenue-raising ballot measures has become an integral part of local government finance, the blanket prohibition on government-funded "campaign activity" may be neither constitutionally required nor socially optimal. The Legislature may wish to clarify the extent to which an agency can engage in an active informational campaign decidedly in favor of or in defense of a measure it has been charged with sponsoring.

With these provisos in mind, I concur in the majority opinion.

Werdegar, J., concurred.

Appellants' petition for a rehearing was denied June 17, 2009.

000856

## APPENDIX A

## REPEAL OF THE UTILITY USERS TAX

On November 5, 2002 Salinas' voters will determine whether to continue or eliminate the City's Utility Users Tax and the services provided by the tax. The Utility Users Tax was instituted in 1969 to provide police, fire library, parks, recreation and capital improvements for Salinas' residents. This year, the City expects $8,060,000 in General Fund revenue or 13% of the City's total General Fund budget from the Utility Users Tax. On July 16, 2002, the Salinas City Council unanimously identified the services that would be eliminated or reduced if the Utility Users Tax is repealed. These services would have to be eliminated or reduced in order to balance the City's budget if the Utility Users Tax is repealed. If the Utility Users Tax is repealed, these program and service reductions will be completed by March 31, 2003.

### Facilities To Be Closed

Breadbox Recreation Center
El Dorado Park Recreation Center
Hebbron Heights Recreation Center
El Gabilan Library
Cesar Chavez Library

Closter Park Recreation Center
Central Park Recreation Center
Firehouse Recreation Center
Municipal Pool

### Programs / Services To Be Eliminated

Volunteer Services
School Crossing Guards
Paramedic Services
Graffiti Abatement
Narcotics & Vice Unit

Neighborhood Services
Hazardous Materials Control
Water Conservation Planning
Literacy Services

### Community Funding To Be Eliminated

Rodeo
Kiddie Kapers Parade
Suicide Prevention / Crisis Center
Oldtown Maintenance
Cultivating Peace Initiative
Community Human Services Project
Sister City Association

Carnival
California International Airshow
Arts Council
Second Chance Youth Program
Sunrise House
Chamber of Commerce
Youth Commission

### Programs / Services To Be Reduced

School Resource Officers
Fire Prevention
Park Maintenance
Animal Control Services

Code Enforcement
Facilities Maintenance
Street Tree Maintenance

Detailed information about the elimination and/or reduction of these programs and services is contained in the June 24, 2002 Report on the Impact of the Utility Users Tax Repeal Initiative. The report is available in City Hall and in all City libraries. The report is also available on the City's web site at www.ci.salinas.ca.us.

## NEWSLETTER City Round-up

Join the City's Volunteer Services Program in celebrating "Make A Difference Day" on Saturday, October 26, 2002. Salinas residents, as part of this national day to help others, will participate in projects designed to beautify City parks as well as home repair projects such as exterior house painting, fence repairs, and landscaping for senior citizens and low-income residents. If you would like to volunteer for this 'onderful adventure of the heart, please contact Cindy Rogers, Volunteer Services Coordinator at 758-7382.

### Inside This Edition

Community Decides Fate of Utility Users Tax ... 1

Highways 68 and 183 ... 2
*Scheduled for Improvements*

Utility Users Tax — ... 3
*Frequently Asked Questions*

Measure O — ... 4
*Impact on Police Services*

Utility Users Tax — ... 5
*Impact on Fire, Recreation and park Services*

Salinas Quiz ... 6

Juncil Promotes Strong Neighborhood Initiative ... 7

Directory of Services ... 8

# Community to Decide Fate of Utility Users Tax

On November 5, 2002 Salinas' voters will determine whether to continue or eliminate the City's Utility Users Tax and the services provided by the tax. The Utility Users Tax was instituted in 1969 to provide police, fire, library, parks, recreation, and capital improvements for Salinas' residents. This year, the City expects $8,060,000 in General Fund revenue or 13% of the City's total General Fund budget from the Utility Users Tax.

On July 16, 2002, the Salinas City Council unanimously identified the services that would be eliminated or reduced if the Utility Users Tax is repealed. These services would be eliminated or reduced in order to balance the City's budget if the Utility Users Tax is repealed. If the Utility Users Tax is repealed, the following program and service reductions will be completed by March 31, 2003.

#### Facilities To Be Closed

| | |
|---|---|
| Breadbox Recreation Center | Cesar Chavez Library |
| Central Park Recreation Center | Closter Park Recreation Center |
| El Dorado Park Recreation Center | El Gabilan Library |
| Firehouse Recreation Center | Hebbron Heights Recreation Center |
| Municipal Pool | |

#### Programs / Services To Be Eliminated

| | |
|---|---|
| Volunteer Services | Neighborhood Services |
| School Crossing Guards | Hazardous Materials Control |
| Paramedic Services | Water Conservation Planning |
| Graffiti Abatement | Literacy Services |
| Narcotics & Vice Unit | |

#### Community Funding To Be Eliminated

| | |
|---|---|
| Rodeo | Carnival |
| Kiddie Kapers Parade | California International Airshow |
| Arts Council | Suicide Prevention / Crisis Center |
| Oldtown Maintenance | Second Chance Youth Program |
| Cultivating Peace Initiative | Sunrise House |
| Chamber of Commerce | Community Human Services Project |
| Sister City Association | Youth Commission |

#### Programs / Services To Be Reduced

| | |
|---|---|
| School Resource Officers | Code Enforcement |
| Fire Prevention | Facilities Maintenance |
| Park Maintenance | Street Tree Maintenance |
| Animal Control Services | |

An overview of the repeal's impacts on the Fire Department, Police Department and Recreation-Park are highlighted in this edition of the Newsletter. Detailed information about the elimination and/or reduction of City programs and services is contained in the June 24, 2002 "Report on the Impact of the Utility Users Tax Repeal Initiative." The report is available at City Hall, at each of the three City libraries as well as available on the City's web site at www.ci.salinas.ca.us.

000859

# INFRASTRUCTURE *Update*

## State of California Sets Date for Hwy 68 and Hwy 183 Road Improvements

California State Highway 68 and Highway 183 are two of the major thoroughfares running through Salinas. The present pavement condition of Highway 68 (South Main and John Streets) and Highway 183 (West Market Street) is poor. A street reconstruction, the most expensive street rehabilitation process may be required to bring these segments of roadway up to City standards. Street reconstruction requires removing the existing pavement section and constructing entirely new street segments. The cost estimates for street reconstruction of arterial streets is approximately $1.5 million per mile.

The deteriorated road condition has resulted in many Salinas residents contacting City Hall and requesting that the City complete immediate repairs similar to those done on other local streets in the past two years. Residents who call are surprised to learn that the City does not own or have jurisdiction on these two segments of roadway to comply with their request.

California cities including Salinas are only allowed to make minimum repairs to state roadways such as pothole repairs. In an effort for the state make these road projects a priority, the City has worked closely with the regional CALTRANS office to get the projects scheduled. As a result of the City's efforts, the State of California Department of Transportation (CALTRANS) has programmed in its budget funding for street pavement rehabilitation of those portions of Highways 68 (South Main and John Streets) and 183 (West Market Street) that run through the City of Salinas.

Completion of roadway repairs to Hwy 68 and Hwy 183 will result in an increase to 92% of all City streets undergoing pavement rehabilitation since the City's aggressive street maintenance program began three years ago. This aggressive street repair program in conjunction with City Council's commitment to adequately fund an ongoing preventive maintenance program will result in an expanded life-span of our community's roadways. Residents with specific questions or concerns about the City's street repair program should contact Senior Civil Engineer Frank Aguayo at 758-7427.

**Map of Hwy 68 Through Salinas**
*Highway 68, which runs through Salinas along South Main Street from John Street to Blanco and John Street to HWY 101 (Hwy 68) is scheduled for street reconstruction in 2004-2005 at a cost of approximately $12.0 million.*

**Map of Hwy 183 through Salinas**
*Highway 183, which runs through Salinas along West Market Street from Davis Road to Monterey Street is scheduled for pavement rehabilitation by CALTRANS in 2005-2006 at a cost of approximately $8 million. The Hwy 183 project will include pavement rehabilitation, new pedestrian ramps that meet the requirements of the federal Americans With Disabilities Act (ADA) curb returns, drainage and street trees.*

## UTILITY USERS TAX

### ANSWERS TO FREQUENTLY ASKED QUESTIONS

Listed below are frequently asked questions about the Utility Users Tax. Residents who would like more detailed information in regards to these questions can visit the City's web site at www.ci.salinas.ca.us or request a copy of the Utility Users Tax report from City Hall or any of the City libraries.

### What is the Utility Users Tax?
The Utility Users Tax is a 6% tax on the following utility charges: gas, electricity, cable television, water and telephone. The Utility Users Tax is the only one of the four major General Fund revenue sources that the City receives 100% of the tax collected. All Utility User Tax dollars stay in the community and are spent entirely for the benefit of City residents. The Utility Users Tax, unlike the other three major General Fund revenue sources: sales tax, property taxes and vehicle license fees are not shared with the state of California, other municipalities or special districts.

### When did the City first begin collecting the Utility Users Tax?
The City began collecting the Utility Users tax in 1969. The original tax rate was 5%. The tax was increased to 6% in 1994.

### Were Citizens ever given an opportunity to vote for the implementation of the Utility Users Tax?
No, however, the Salinas City Charter allows for the repeal of any adopted ordinance by a majority of the voters. The residents of Salinas and their elected representatives on the City Council could have considered the repeal of this tax anytime during the last thirty-three years.

### How much revenue is generated by the Utility Users Tax?
This year, the City expects approximately $8 million in General Fund revenue or 13% of the City's total General Fund budget from the Utility Users Tax.

### How much does the average resident pay annually in Utility Users Taxes?
It is estimated that the average Salinas Household pays approximately $124.00 each year in Utility User Taxes. This is approximately .34 cents a day.

### What does the City do with the money collected from the Utility Users Tax?
The Utility Users Tax dollars are deposited in the City's General Fund budget and it is used to provide funding for important government services including Police, Fire, recreation programming, library services and park maintenance as well as the City's General Fund Capital Improvement Program.

### Do residents currently have a voice in how the Utility Users Tax revenue is spent?
Yes, the Utility Users Tax is considered General Fund Revenue. Unlike revenue received from the federal or state government, the Salinas community determines how this money is spent each year. Residents are encouraged to participate in the annual budget process to determine what services are provided for the benefit of the community.

### Is there any fixed income exemptions for the Utility Users Tax?
No, however, the City encourages low-income residents to apply for a variety of programs sponsored by utility companies that reduce utility bills. Examples of these programs include: PG&E's CARE Program, which provides low-income households a 20% discount on monthly energy bills; and Pacific Bell's Universal Lifeline Telephone Service that provides discounted residential telephone service to its customers who meet certain requirements.

### Do Other Cities Collect a Utility Users Tax?
Yes. Many other cities in Monterey and Santa Cruz Counties as well as throughout the state have a utility users tax. Cities with utility users taxes include the City of Monterey, City of Santa Cruz, King City, Gonzales, Pacific Grove and Watsonville.

APPENDIX B

## CUTS TO POLICE SERVICES EXPECTED IF MEASURE O IS APPROVED BY VOTERS

The magnitude of budget reductions resulting from the potential passage of Measure O, the initiative to repeal the Utility Users Tax, would force the City to cut programs and services in the Police Department totaling $1.7 million. The $1.7 million in proposed service cuts include: elimination of the School Crossing Guard Program, reductions in Support Services, such as removal of abandoned vehicles from public streets, elimination of the Narcotics and Vice Unit, reductions to the School Resource Officer Program, and reductions in the Animal Services Program. According to Police Chief Daniel Ortega, each of the programs to be eliminated or reduced significantly impact Salinas' "community policing philosophy" and the Department's ability to tailor services to meet specific community needs.

The chart illustrates the fiscal impacts of the proposed cuts.

| PROGRAM | IMPACT OF BUDGET CUTS | BUDGET REDUCTION |
| --- | --- | --- |
| School Crossing Guards | Elimination of Program | $163,000 |
| Support Services | Reduction in Services Such as Vehicle Abatement | $109,000 |
| Narcotics and Vice | Elimination of Program | $768,000 |
| School Resource Officers | Reduction in Number of Schools Served | $585,100 |
| Animal Control | Reduction in Animal Shelter Services | $111,200 |
| | TOTAL | $1,737,300 |

*Residents interested in learning more about the potential impacts to Police Services can visit the City's Web Site at www.ci.salinas.ca.us or pick up a copy of the City Manager's Utility Users Tax report at the City Hall or at any of the three City libraries.*

Methamphetamine lab.
The proposed elimination of the Narcotics and Vice Unit will hamper Police Department's ability to promote the City Council's #1 goal of maintaining a safe and peaceful community.

Students at 27 Salinas schools will lose the benefit of supervised street crossing as a result of the repeal of the Utility Users Tax.

### APPENDIX B

000862

# REPEAL OF UUT IMPACTS ON FIRE SERVICES

The Fire Department's budget, if Measure O, the Utility Users tax is repealed, will result in an annual budget reduction of $1,036,000 ($1.036 million). This cut of approximately 10% of the Department's $9.9 million budget will result in the elimination or reduction of the following programs.

| PROGRAM | IMPACT OF BUDGET CUTS | BUDGET REDUCTION |
|---|---|---|
| Paramedic Services | Elimination of Program/Conversion of 21 Paramedic/Firefighters to Firefighter only positions | $414,600 |
| Paramedic Rescue Squad | Elimination of Program/Slower response time for emergency medical response call | $439,500 |
| Hazardous Materials Control/ Response | Elimination of Program/Eliminates a first line defense against Bio/Chemical terrorism | $69,100 |
| Fire Prevention | Slower construction plan approval process/ Elimination of fire prevention school presentations for over 15,000 students annually | $112,900 |
| | TOTAL | $1,036,000 |

*A detailed report of the potential impacts of Measure O on the City's Fire Department budget reductions are available on line at the City's Web Site (www.ci.salinas.ca.us). Paper copies of the City Manager's Utility Users Tax Report are available at City Hall or at any of the three City libraries.*

# FINANCIAL IMPACTS: ELIMINATION OF UTILITY USERS TAX ON RECREATION-PARK SERVICES

The Mission of the City's Recreation-Park Department is to enhance life through high quality recreation, educational, social and cultural programs, events and leisure activities which are responsive to a diverse population. The potential impacts of the proposed repeal of the Utility Users Tax will make it difficult for the Recreation-Park Department to successfully carry out this mission.

The Department's approved operating budget for fiscal year 2002-2003 that began July 1st is $3,791,700. The proposed Utility Users Tax repeal will result in budget cuts totaling $1,153,700 or 30% of the Department's total operating budget. The impacts of these cuts will result in the closure of the following facilities: Breadbox Recreation Center, Closter Park Recreation Center, Central Park Recreation Center, El Dorado recreation Center, Firehouse Recreation Center, Hebbron Heights Recreation Center and the Municipal Swimming Pool.

More than 600,000 uses for Recreation-Park programming and services are recorded annually. If the Utility Users Tax is repealed, the following programs will be eliminated:

■ Senior Program at the Firehouse Recreation
■ Tiny Tots Day Program for 3 to 5 years olds eliminated at Central Park, Closter Park and El Dorado Park
■ Closure of the City's Skateboard and BMX Facilities
■ Elimination of drop-in programs at the Breadbox, Closter Park, Central Park, the Firehouse and Hebbron Heights
■ Elimination of cultural, arts and athletic programs at all facilities scheduled for closure
■ Closure of the City's only year round public swimming pool

*A detailed report of the potential impacts of Measure O on Recreation-Park is available by visiting the City's Web Site at www.ci.salinas.ca.us or by picking up a copy of the City Manager's Utility Users Tax Report at City Hall or at any of the three City libraries.*

## APPENDIX B

000863

### Salinas Quiz

The City of Salinas Forestry Division plays an important role in ensuring the health of trees in our community since native and planted woodlands provide benefits for all residents, including protection of our valuable soils, recreational opportunities, wildlife habitat, and beauty. This edition of the Salinas Quiz focuses on our feathered friends who use the trees of Salinas for food and shelter. Good luck to all those brave enough to take the quiz and consider yourself a Salinas scholar if you can correctly answer eight of the ten questions.

*1.* Each species of bird has its preferred habitat or home area. Which one of the following birds is most likely to be found on Salinas' city streets?
(a) House Sparrow
(b) House Wren
(c) Northern Mockingbird
(d) Western Meadowlark

*2.* Which one of the following birds is most likely found eating worms in Salinas?
(a) Turkey Vulture
(b) Worm-eating Warbler
(c) American Robin
(d) Black Oystercatcher

*3.* Animals play an important symbolic role in John Steinbeck's novel "The Grapes of Wrath." In Chapter 14, John Steinbeck describes a waitress shouting out food orders as "screeching like a
_____."
(a) American Crow
(b) Northern Mockingbird
(c) Turkey Vulture
(d) Peacock

*4.* A popular hummingbird seen in the gardens of Salinas are Anna's. Hummingbirds fly upward, forward, backward, sideways, upside down and hover. The hummingbird, in order to carry out these aeronautical feats, beats its wings at a rate of _____ times per second.
(a) 100
(b) 200
(c) 300
(d) 400

*5.* Backyard birders know the best way to bring an American Goldfinch, with its bright yellow feathers, to their property is to set up a feeder containing:
(a) Sunflower Seeds
(b) Blackberries
(c) Niger Seed
(d) Pumpkin Seeds

*6.* Knothead and Splinter were nephews of _____
(a) Daffy Duck
(b) Tweety Bird
(c) Heckle and Jeckle
(d) Woody Woodpecker

*7.* A favorite nesting spot for Orioles, not the baseball kind, are palm trees. The oriole species that makes its home in Salinas is:
(a) Audubon's Oriole
(b) Hooded Oriole
(c) Spot-breasted Oriole
(d) Orchard Oriole

*8.* Raptors such as hawks, falcons and owls assist in keeping down Salinas' rodent population. A nesting pair of barn owls with young, can capture between #____ to #____ rodents each night:
(a) 6 to 10
(b) 12 to 15
(c) 15 to 18
(d) 20 to 25

*9.* Natividad Creek Park located on Nogal Drive is the home to many different species of birds. Birdwatchers are always in for a treat when this small falcon is seen hovering or perched on wires hunting insects and small mammals.
(a) Prairie Falcon
(b) White-tailed Kite
(c) Peregrine Falcon
(d) American Kestrel

*10.* Michael Jackson had birds on his mind when he sang this famous song that raced to the top of the charts:
(a) Ben
(b) Fly Robin Fly

Answers:
1 (a) 2 (c) 3 (d) 4 (b) 5 (c) 6 (d) 7 (b) 8 (d) 9 (d) 10 (a)

APPENDIX B 000864

## City Council Promotes Strong Neighborhood Initiative

The Salinas City Council in its efforts to promote strong neighborhoods has developed the Neighborhood Problem Solver. The Neighborhood Problem Solver is a 70-page step-by-step "how to" guide that is designed to assist residents in improving their neighborhood's overall quality of life.

The idea for the Neighborhood Problem Solver was developed by City Council at meetings held with concerned residents. City Council acknowledged that the City could not solve every resident's concern through a telephone call to City Hall. However, City Council did promise residents that it would seek out new "tools" and resources to provide residents assistance in solving problems that extended beyond the City's jurisdiction or available resources.

City Council, as a result of these meetings, requested that the City Administration identify new "tools" and resources that would assist residents:

- Experiencing a problem or series of problems that requires significant resources and time to resolve;
- Unable to determine where to find assistance in resolving a community problem; and
- Already involved in active neighborhood organizations but are in need of technical assistance.

The Neighborhood Problem Solver does this and more. The Neighborhood Problem Solver and the optional technical training provided by the Neighborhood Services Coordinator are designed to assist residents in creating solutions that meet specific community needs. The Neighborhood Problem Solver is written in English and Spanish offering assistance in:

- Problem identification
- Organizing and rallying the community around a problem or set of issues
- Conducting effective meetings
- Assistance in finding meeting room space
- Organizing a neighborhood cleanup
- Identifying community resources
- Dealing effectively with the media

Salinas Kids House organized a community planting event on Seiber Street.

The Neighborhood Problem Solver is not a "magic potion" or panacea for ending problems in Salinas. However, City Council is confident that this new "tool" is empowering and will assist Salinas residents in improving the quality of life of their neighborhoods. The

Neighborhood Problem Solver is available on-line at www.ci.salinas.ca.us or at the reference counter of the City's three libraries. Salinas' residents interested in learning more about the Neighborhood Problem Solver and its related training can contact Anna Velazquez, Neighborhood Services Coordinator at 758-7229.

Jaclyn and Talde are graffiti abatement volunteers.

PRESORTED
STANDARD
U.S. POSTAGE
PAID
SALINAS, CA.
PERMIT NO. 674

City Hall
200 Lincoln Ave.
Salinas, CA 93901

City Round-up

## Who do I call about...

Abandoned/Inoperative Vehicles: ..........................831.758.7316
Animal Control /Shelter: ...................................831.758.7285
Assessors Office (Monterey County): ..........................831.765.5035
Barking Dog Complaints: ...................................831.758.7285
Building Permits: .............................................831.758.7251
Business Licenses: ...........................................831.758.7211
Dog Licenses: ................................................831.758.7211
City Clerk (City Records/Meeting Agendas): .....................831.758.7381
Code Enforcement: ..........................................831.758.7157
Conflict Resolution (Mediation Center of Monterey County): ..831.424.4694
Garage, Yard, Patio Sales: .................................831.758.7211
Garbage Service (BSI): ......................................831.775-3840
Garbage Accumulation (trash, junk, debris): .................831.755.4500
Graffiti: .....................................................831.758.7928
Hazardous materials disposal: ............................831.758.7928
Home businesses: ...........................................831.758.7206
Home Repair Loans (Qualified Low Income Residents): ......831.758.7334

John Steinbeck Library: .....................................831.758.7311
Marriage License, Birth Certificates,
Death Certificates (Monterey County Recorders Office): ......831.755.5041
Municipal Swimming Pool: ..................................831-758-7301
Noise Complaints (Loud Music, Loud Parties): .................831.758.7321
Police — non-emergency number: ..........................831.758.7321
Neighborhood Watch Programs: ............................831.758.7264
Parking Tickets: .............................................831.758.7211
Recycling/Solid Waste Authority: ..........................831.755.1300
Sidewalk/Street Maintenance: ............................831.758.7233
Sherwood Hall/Community Center: .......................831.758.7351
Street Light Outages: ......................................831.758.7233
Street Sweeping: ...........................................831.758.7233
Street Trees: ................................................831.758.7233
Traffic Signals & Signs: ...................................831.758.7233
Weed Abatement: ...........................................831.758.7119
Zoning: .....................................................831.758.7206